✓ FILED ___ ENTERED
___ LOGGED ___ RECEIVED

4:21 pm, Sep 26 2024

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____TTD_____ Deputy

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | CASE NO. 24 - 2349 - ADC |
| | * | CASE NO. 24 - 2350 |
| **MICHAEL MICKLOS, JR.** | * | CASE NO. 24 - 2351 |
| a/k/a "Buckets," | * | CASE NO. 24 - 2352 |
| **CAN XU,** | * | CASE NO. 24 - 2353 |
| a/k/a "Shawn," | * | CASE NO. 24 - 2354 |
| **PRAVEEN MORGAN,** | * | CASE NO. 24 - 2355 |
| a/k/a "Veen," | * | CASE NO. 24 - 2356 |
| **MALIK BRIDGERS,** | * | CASE NO. 24 - 2357 |
| **HUAYI ZHONG,** | * | CASE NO. 24 - 2358 |
| **ZEBIN LIU,** | * | |
| **CHUNBING QIN,** | * | **FILED UNDER SEAL** |
| **QIHAI TAO,** | * | |
| **PENG HUANG, and** | * | |
| **ISAAC HUYNH,** | * | |
| | * | |
| Defendants. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................3

II.     AFFIANT'S EXPERTISE .....................................................................6

III.    PROBABLE CAUSE ...........................................................................10

    A.      BACKGROUND ...........................................................................10

    B.      AUTHORIZATION FOR TITLE 3 INTERCEPTS…………………………13

    C.      TARGET SUBJECTS, SUBJECT PREMISES, TARGET VEHICLE, and ARREST SUBJECTS Overview ......................................................................15

    D.      MALIK BRIDGERS, THE ROCKFIELD PREMISES, THE WOODMONT PREMISES, and THE NICHOLSON PREMISE………………………...…….21

    E.      EMANUEL DUKES, THE SHAWAN PREMISES, and THE CLEARVIEW PREMISES……………………………………………………………...30

    F.      THE PRESIDENT PRMISES, THE PULASKI PREMISES, THE HUNT RIDGE PREMISES, and THE TARGET VEHICLE………………………..35

    G.      THE SCHERING PRMISES, THE EVERGREEN PREMISES, and THE FORT PREMISES………………………………………………………...44

    H.      MARCO JONES and THE FORT PREMISES………………………...55

    I.      PRAVEEN MORGAN…………………………………………………62

    J.      CAN XU, HUAYI ZHONG, ZEBIN LIU, CHUNBING QIN, QIHAI TAO, PENG HUANG, and ISAAC HUYNH…………………………………...66

IV.     BIOMETRIC UNLOCKING…………………………………………80

V.      CONCLUSION………………………………………………………..82

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANTS AND IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS

Your affiant, Ryan Welsh, a Special Agent with the Drug Enforcement Administration ("DEA"), being duly sworn, deposes and states as follows:

## I.   PURPOSE OF THIS AFFIDAVIT

1.   Pursuant to Federal Rule of Criminal Procedure 41, I make this affidavit in support of applications for a criminal complaint, arrest warrants, and search warrants.

2.   As discussed further below, an investigation into two separate non-fatal shootings of one individual in Baltimore, Maryland has revealed a sprawling network of individuals laundering millions of dollars generated from the illegal distribution of massive quantities of marijuana.  That network includes large-scale launderers and drug traffickers operating in Maryland and sending large quantities of bulk cash proceeds from Maryland to other states, including New York, New Jersey, and Washington to obtain further shipments of marijuana and to conceal the source of the proceeds.  Further up within the network, individuals (based primarily in New York) collect millions of dollars in proceeds from Maryland and other states that they then transport (via various means) to other launderers and drug traffickers in Washington state and elsewhere to obtain larger shipments of marijuana and ensure that the source of the cash is concealed.

3.   Specifically, I make this affidavit in support of applications for search warrants for the following locations (collectively, the "**SUBJECT PREMISES**"):

   a.   6962 Rockfield Road, Catonsville, Maryland 21244 ("THE ROCKFIELD PREMISES"), further described in Attachment A-1;

   b.   5454 Nicholson Lane, Apt 412, North Bethesda, Maryland 20852 ("THE NICHOLSON PREMISES"), further described in Attachment A-2;

c.      5961 Schering Road, Rosedale, Maryland 21206 ("THE SCHERING PREMISES"), further described in Attachment A-3;

d.      3701 Evergreen Avenue, Baltimore, Maryland 21206 ("THE EVERGREEN PREMISES"), further described in Attachment A-4;

e.      8001 Woodmont Avenue, Apt 406, Bethesda, Maryland 20814 ("THE WOODMONT PREMISES"), further described in Attachment A-5;

f.      900 E. Fort Ave, Apartment 518, Baltimore, Maryland 21230 ("THE FORT PREMISES"), further described in Attachment A-6;

g.      2907 Clearview Avenue, 2nd floor, Baltimore, Maryland 21234 ("THE CLEARVIEW PREMISES"), further described in Attachment A-7;

h.      555 President Street, Unit 602, Baltimore, Maryland 21202 ("THE PRESIDENT PREMISES"), further described in Attachment A-8;

i.      2027 North Pulaski Street, Baltimore, Maryland 21217 ("THE PULASKI PREMISES"), further described in Attachment A-9;

j.      6006 Hunt Ridge Road, Apt 2521, Baltimore, Maryland, 21210 ("THE HUNT RIDGE PREMISES"), further described in Attachment A-10;

k.      100 Shawan Road, Apt. 245, Cockeysville, Maryland, 21030 ("THE SHAWAN PREMISES"), further described in Attachment A-11;

4.      I further submit this affidavit in support of search warrants for the following people (collectively, the "**TARGET SUBJECTS**"):

a.      the person of Malik BRIDGERS ("BRIDGERS"), a black male with a date of birth of ███████, further described in Attachment A-12;

b.      the person of David HILLIARD ("HILLIARD"), a black male with a date of birth of ▉▉▉▉▉▉▉▉, further described in Attachment A-13;

c.      the person of Derian GREEN ("GREEN"), a black male with a date of birth of ▉▉▉▉▉▉▉, further described in Attachment A-14;

d.      the person of Marco JONES ("JONES"), a black male with a date of birth of ▉▉▉▉▉▉▉, further described in Attachment A-15;

e.      the person of Emanuel DUKES ("DUKES"), a black male with a date of birth of ▉▉▉▉▉▉▉, further described in Attachment A-16;

f.      the person of Steven MACK ("MACK"), a black male with a date of birth of ▉▉▉▉▉▉▉, further described in Attachment A-17;

g.      the person of Omar BROWN ("BROWN"), a black male with a date of birth of ▉▉▉▉▉▉▉▉, further described in Attachment A-18;

5.      I further submit this affidavit in support of a search warrant for the following vehicle (the "**TARGET VEHICLE**");

a.      a 2022 Chevrolet Tahoe bearing Maryland registration 6GD5306 and vehicle identification number (VIN) 1GNSKPKD1NR242429, and registered to Steven Leroy Mack Jr., 5503 Chandler Avenue, Baltimore, Maryland 21207 (hereinafter "**TARGET VEHICLE**"); further described in Attachment A-19;

6.      Finally, I submit this Affidavit in support of a criminal complaint and arrest warrants for the following individuals: BRIDGERS; Michael Micklos, Jr. ("MICKLOS"); Can Xu ("XU"); Praveen Morgan ("MORGAN"); Huayi Zhong ("ZHONG"); Zebin Liu ("LIU"); Chunbing Qin ("QIN"); Qihai Tao ("TAO"); Peng Huang ("HUANG"); and, Isaac Huynh ("HUYNH") (the "**ARREST SUBJECTS**").

7. Based upon my training and experience, I submit that there is probable cause to believe that the **TARGET SUBJECTS** use the **SUBJECT PREMISES** in furtherance of criminal activity, including, violations of 18 U.S.C. 1956(h) (Conspiracy to Commit Money Laundering) and 21 U.S.C. 846 (Conspiracy to Distribute Controlled Substances) (collectively, the **SUBJECT OFFENSES**). I further submit that there is probable cause to believe that the **TARGET SUBJECTS** and the **SUBJECT PREMISES** contain fruits, evidence, and instrumentalities, as more fully described in Attachment B, of said **SUBJECT OFFENSES**.

8. Based on the facts in this Affidavit, I respectfully submit that there is probable cause to believe that the **ARREST SUBJECTS** have committed the following offenses: 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering) and 21 U.S.C. § 846 (Conspiracy to Distribute Controlled Substances).

## II. AFFIANT'S BACKGROUND AND EXPERTISE

9. I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of United States Code Title 18.

10. I have been a DEA Special Agent ("SA") since December 2020. I am currently assigned to the Baltimore District Office, Strike Force 1 group, which investigates drug trafficking organizations and their ties to violence. I received 14 weeks of training in narcotics investigations and related legal matters at the DEA Training Academy in Quantico, Virginia.

11. Prior to my employment as an SA with the DEA, I was employed as a police officer/detective by the Baltimore Police Department from January 14, 2014, until September 4, 2020. During my law enforcement career with the Baltimore Police Department, I spent

approximately two years in the Northwest District drug unit conducting street-level drug investigations, followed by three years as a Task Force Officer ("TFO") with Strike Force 1 of the DEA. During my time as a TFO in Strike Force 1, I conducted high-level narcotics investigations to include wiretap investigations of violent street-level drug trafficking organizations ("DTOs") and kilogram quantity drug traffickers. As a result, I have been involved in the arrests of drug traffickers.

12. During my time as a law enforcement officer, I have participated in multiple investigations involving money laundering and drug trafficking to include the use of Title III ("T-III") wiretaps, confidential informants, undercover transactions, physical and electronic surveillance, telephone toll analysis, the execution of search and seizure warrants, and the recovery of substantial quantities of narcotics.

13. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the possession and use of firearms in connection with trafficking of such drugs, and the methods by which narcotics traffickers collect, store, conceal, and launder the proceeds of their illegal activities. I have also become familiar with how drug traffickers use telephones, cellular telephone technology, pagers, coded communications or slang-filled telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

14. Through training, interviewing of dozens of persons arrested for controlled substance offenses, watching hundreds of hours of surveillance of suspected drug traffickers, and monitoring of countless hours of intercepted communications involving drug trafficking, I am familiar with the actions, traits, habits, and terminology utilized by drug traffickers.

15. Based upon that training and experience, I have learned the following:

a.	Drug traffickers keep and maintain records of their various activities.  Such records are regularly concealed in a suspect's automobile, residence, office, and on his person, and that they take various forms.  Documents commonly concealed by drug traffickers, include but are not limited to notes in code, deposit slips, wired money transactions, hidden bank accounts, photographs of co-conspirators, various forms of commercial paper, personal address books, notebooks, records, receipts, ledgers, travel receipts (rental receipts, airline tickets, bus tickets, and/or train tickets) both commercial and private, money orders and other papers relating to the ordering, transportation, sale and distribution of controlled dangerous substances or other such documents which will contain identifying data on the co-conspirators.  These items are kept in locations that are considered safe by the drug traffickers such as safety deposit boxes, residences, vehicles and on their person, where they have ready access to them. Drug traffickers often have several residences decreasing the likelihood of detection by law enforcement;

b.	Drug traffickers may use computers or other electronic storage media, including smart phones, to store the records of documents listed in paragraph a;

c.	 Drug traffickers maintain on hand large amounts of cash to maintain and finance their narcotics business, which is typically concealed in their residences or vehicles along with financial instruments and evidence of financial transactions relating to narcotics trafficking activities;

d.	Drug traffickers engage in activities designed to conceal the nature, source, location, ownership, or control of drug proceeds;

e.	Drug traffickers use cellular telephones, pagers and other electronic communications devices to facilitate illegal drug transactions. The electronically stored information on these devices is of evidentiary value in identifying other members of the drug trafficking conspiracy and establishing the relationship between these individuals, including photographs and other identifying information stored on these devices;

f.	Drug traffickers commonly possess firearms and other weapons to protect and secure their narcotics and money from loss to law enforcement agents or other members of the criminal element that are motivated by greed; and

g.	Drug traffickers commonly possess packaging material, cutting agents, digital scales, and other items used in the preparation and packaging of controlled substances.

h.	Drug traffickers commonly use vehicles to conceal and transport ledgers, packaging materials, cutting agents, digital scales, illegal drugs, proceeds from illegal drug sales, and other items associated with illegal drug trafficking. These vehicles are often purchased with illegal drug proceeds and are often registered in the names of other persons to conceal the identity of the drug trafficker who uses the vehicle.

16.	Because this affidavit is being submitted for the purpose of establishing probable

cause to issue a complaint and arrest warrant for the **ARREST SUBJECTS**, and to search the

**TARGET SUBJECTS,** the **SUBJECT PREMISES,** and the **TARGET VEHICLE**, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. I have not, however, excluded any information known to me that would defeat a determination of probable cause. The information contained in this affidavit is based upon my personal knowledge, my review of documents and intercepted conversations, as well as conversations with other law enforcement officers and other individuals. All conversations and statements described in this affidavit are related in substance and in part unless otherwise indicated. Summaries and descriptions, including quotations, of recorded conversations are based upon my review of the audio recordings. Because this investigation relied upon the interception of wire and electronic communication over cellular telephones, I have included my interpretation of those communications throughout this affidavit, and in some instances have placed in parentheses my "translation" of the words or terminology used, or placed in brackets additional words necessary to clarify and/or complete the conversation. These interpretations, as well as my opinions contained herein, are based upon my training and experience, as well as my knowledge gained during this investigation of the operation of this particular money laundering and drug trafficking organization.

17. The below communications are being intercepted in several languages to include English, Taishan, Cantonese and Mandarin. Investigators are utilizing certified and vetted DEA third-party translators who are embedded within the wire room and listen to intercepted calls in real time, then transcribe those calls on a rolling basis. References to any calls made in a foreign dialect in this affidavit have been translated by this team of translators, who are qualified and trained to translate Taishan, Cantonese and Mandarin, and other regional dialects, into English.

### III.    PROBABLE CAUSE

#### A.    BACKGROUND

18.    In February 2023, Detectives with the Baltimore Police Department (BPD) contacted the DEA and advised they were investigating the non-fatal shooting of an individual identified as Michael MICKLOS Jr.  Detectives explained that MICKLOS had recently been involved in what they believed was a drug deal gone bad where MICKLOS was shot at but not injured. During that investigation, detectives recovered over five pounds of marijuana and over $100,000 in bulk U.S. currency from MICKLOS' rental vehicle.

19.    Approximately a week later, in a separate incident, BPD arrived at the 3800 block of Wabash Avenue in Baltimore, Maryland in response to a report of a shooting.  MICKLOS, who was located at the scene, had been shot multiple times to his pelvic region.  Due to the severity of his injuries, he was transported to Maryland Shock Trauma for immediate medical attention. Investigating officers discovered several shell casings on a roadway and a nearby apartment complex parking lot.  Investigating officers also located a vehicle with significant amounts of blood in the driver and passenger areas, as well as other vehicles and property damaged by fired bullets.  A canvass of the area resulted in investigators recovering multiple pounds of marijuana that MICKLOS attempted to discard prior to police arrival.  MICKLOS refused to cooperate or provide additional information to detectives during their investigation.

20.    In December 2023, in follow up to this initial investigation, I utilized an undercover Instagram account to monitor Instagram accounts of suspected drug dealers and money launderers, including MICKLOS.   I identified an Instagram account—labelled "1Buckets"—that was viewable to the public. This account contained several photographs of MICKLOS, which led me to believe that the "1Buckets" account was used by MICKLOS.  I have also corroborated through

MICKLOS' social media posts, as well as intercepts on the wiretap, that "Buckets" is a moniker utilized by MICKLOS.

21.    As to the Instagram account, I viewed photographs of MICKLOS posing with large amounts of cash. In some of those same photographs, thousands of dollars in bulk U.S. currency and pound quantities of marijuana can be seen (as further depicted below):



22.    I also viewed videos posted by MICKLOS that showed large amounts of suspected drug proceeds, with his personal diamond necklace laid across the money (as depicted below):



23. Furthermore, the Instagram account promoted a "Telegram"[1] page where MICKLOS marketed pound quantities of marijuana for sale. MICKLOS listed different strains of marijuana he had available as well as prices from as low as $600 to upwards of $1,500, per pound. MICKLOS claimed to have the lowest prices on the East Coast and the ability to ship marijuana worldwide. The "Telegram" account listed two telephone numbers, including ████ 7983, to place a marijuana order (as depicted below):



24. Based on the above-described events, coupled with the photos and videos on MICKLOS' Instagram account, I believe MICKLOS is a leader of a well-structured nationwide

---

[1] Telegram Messenger, commonly known as Telegram, is a cloud-based, cross-platform, social media and instant messaging service.

marijuana trafficking organization that generated significant amounts of drug proceeds (the "MICKLOS DTO") and that MICKLOS and others were involved in money laundering and concealing the nature, source, location, ownership, or control of those proceeds.

25. Since the inception of the investigation, agents have utilized numerous techniques, including undercover purchases, surveillances, search warrants, GPS tracking and other investigative techniques, to further investigate the drug proceeds of the MICKLOS DTO.

26. These investigative steps ultimately led to T-III authorization to intercept MICKLOS's communications, as further detailed *infra*.

**B. AUTHORIZATION TO INTERCEPT TELEPHONIC COMMUNICATIONS**

27. On March 1, 2024, the Honorable Julie R. Rubin, United States District Judge for the District of Maryland, authorized the interception of electronic communications occurring over ▮▮▮7983 (**TARGET TELEPHONE 1**), utilized by an individual identified as MORGAN; and further authorized the interception of wire and electronic interceptions occurring over ▮▮ ▮▮1710 (**TARGET TELEPHONE 2**), utilized by Michal Tilmon III ("TILMON"), and phone number ▮▮▮6556, utilized by JONES (**TARGET TELEPHONE 3**).

28. On April 5, 2024, Judge Rubin authorized the continued interception of electronic communications over ▮▮▮7983 (**TARGET TELEPHONE 1**) and wire and electronic interceptions over ▮▮▮1710 (**TARGET TELEPHONE 2**) and wire interceptions over ▮▮ ▮▮6556 (**TARGET TELEPHONE 3**). Judge Rubin also authorized the initial interception of wire communications over ▮▮▮4237 (**TARGET TELEPHONE 4**), utilized by BRIDGERS, phone number ▮▮▮4197 (**TARGET TELEPHONE 5**), also utilized by BRIDGERS, phone number ▮▮▮0093 (**TARGET TELEPHONE 6**), utilized by XU and phone number ▮▮▮ 4571 (**TARGET TELEPHONE 7**), utilized by ZHONG.

29.     On May 3, 2024, Judge Rubin authorized the continued interception of wire and electronic communications over ▓▓▓▓ 1710 (**TARGET TELEPHONE 2**), ▓▓▓▓ 4237 (**TARGET TELEPHONE 4**), ▓▓▓▓ 4197 (**TARGET TELEPHONE 5**), ▓▓▓▓ 0093 (**TARGET TELEPHONE 6**) and ▓▓▓▓ 4571 (**TARGET TELEPHONE 7**). Judge Rubin also authorized the initial interception of wire communications over ▓▓▓▓ 3256 (**TARGET TELEPHONE 8**), utilized by MICKLOS, ▓▓▓▓ 4976 (**TARGET TELEPHONE 9),** utilized by MICKLOS, phone number ▓▓▓▓ 2921 (**TARGET TELEPHONE 10**), thought to be utilized by Eddie Lin ("LIN"), phone number ▓▓▓▓ 6318 (**TARGET TELEPHONE 11**), utilized by TAO, and wire and electronic communications over ▓▓▓▓ 4214 (**TARGET TELEPHONE 12**), utilized by MICKLOS.

30.     On May 31, 2024, Judge Rubin authorized the continued interception of wire and electronic communications over ▓▓▓▓ 0093 (**TARGET TELEPHONE 6**) and ▓▓▓▓ 4571 (**TARGET TELEPHONE 7**), wire communications over ▓▓▓▓ 4976 (**TARGET TELEPHONE 9),** wire communications over ▓▓▓▓ 6318 (**TARGET TELEPHONE 11**) and the wire and electronic communications over ▓▓▓▓ 4214 (**TARGET TELEPHONE 12**). Judge Rubin also authorized the initial interception of wire communications over ▓▓▓▓ 0636 (**TARGET TELEPHONE 13**), utilized by Anya Dai ("DAI").

31.     On June 27, 2024, Judge Rubin authorized the continued interception of wire and electronic communications over ▓▓▓▓ 0093 (**TARGET TELEPHONE 6**) and ▓▓▓▓ 4571 (**TARGET TELEPHONE 7**) and the interception of wire communications over ▓▓▓▓ 4976 (**TARGET TELEPHONE 9),** wire communications over ▓▓▓▓ 6318 (**TARGET TELEPHONE 11**) and the wire and electronic communications over ▓▓▓▓ 4214 (**TARGET TELEPHONE 12**) and ▓▓▓▓ 0636 (**TARGET TELEPHONE 13**).

32.     On July 24, 2024, Judge Rubin authorized the continued interception of wire and electronic communications over ▆▆▆▆0093 (**TARGET TELEPHONE 6**) and ▆▆▆▆4571 (**TARGET TELEPHONE 7**) and the interception of wire communications over ▆▆▆▆4976 (**TARGET TELEPHONE 9),** wire communications over ▆▆▆▆6318 (**TARGET TELEPHONE 11**), wire and electronic communications over ▆▆▆▆4214 (**TARGET TELEPHONE 12**) and the initial interception of wire and electronic communications ▆▆▆▆ 8088 (**TARGET TELEPHONE 14**), utilized by Qing Meng ("MENG").

33.     Over the course of these interceptions, investigators identified DTO members operating under MICKLOS's direction in various cities throughout the United States. Investigators were further able to identify sources of supply responsible for supplying the MICKLOS DTO with thousands of pounds of marijuana.  To date throughout this investigation, investigators have conducted enforcement operations leading to the seizure of approximately 300 pounds of marijuana, firearms, over $3 million in bulk U.S. currency, and other evidence of drug trafficking and money laundering.

### C. OVERVIEW OF TARGET SUBJECTS, SUBJECT PREMISES, TARGET VEHICLE, and ARREST SUBJECTS[2]

34.     **MICHAEL MICKLOS, Jr.**: MICKLOS is the leader and mastermind behind a multimillion-dollar marijuana distribution network operating in: Baltimore, Maryland; Richmond, Virginia; the greater New York area; and, Allentown, Pennsylvania.  MICKLOS is also the user of **TARGET TELEPHONE 9** and **TARGET TELEPHONE 12**.  MICKLOS also sources marijuana for illegal distribution, and launders his drug proceeds, with the assistance of XU.

---

[2] This overview section is included to provide a general summary of the relevance of each TARGET SUBJECT, SUBJECT PREMISES, ARREST SUBJECT, and the TARGET VEHICLE.  The assertions made herein are further articulated in the following sections of the probable cause section of the affidavit.

35.     **CAN QUAN XU**: XU, a/k/a "Shawn," has been identified as a multi-million-dollar marijuana distributor operating a DTO in New York, as well as the leader of a well-structured money laundering organization ("MLO") in which he employs several confederates to conceal the nature, source, location, ownership, or control of the drug proceeds. XU and his associates work with marijuana sources of supply to obtain bulk quantities of marijuana and then repackage, rebrand, and distribute the marijuana to customers for distribution on the east coast. XU then collects millions of dollars in drug trafficking proceeds from his customers, which he then turns back over to his suppliers and/or sends to bank accounts located in the People's Republic of China (PRC) using wire transfers. XU also uses the money earned through his drug trafficking for both personal use and to promote the activities of the DTO, including paying rent at locations used as stash houses, paying members of his DTO, purchasing properties, and purchasing vehicles. XU is the user of **TARGET TELEPHONE 6**.

36.     **PRAVEEN MORGAN**: MORGAN is a member of the MICKLOS DTO who is responsible for receiving marijuana orders from customers for each DTO in every city to include Baltimore, Maryland, which occur over **TARGET TELEPHONE 1**. MORGAN is also responsible for keeping inventory of the marijuana the DTO has sold in each city and the amount of drug proceeds that have been collected. MORGAN does not have a criminal history.

37.     **Malik BRIDGERS and THE ROCKFIELD PREMISES, THE WOODMONT PREMISES and THE NICHOLSON PREMISES**: BRIDGERS has been identified as the leader of a large-scale marijuana DTO in Baltimore. This DTO is being supplied by XU, a New York-based marijuana supplier, as described above. BRIDGERS is also running a "Telegram" channel where he markets his marijuana for sale and lists his telephone device for customers to send orders to. BRIDGERS uses multiple telephone devices, including ████ 4197 (**TARGET**

**TELEPHONE 4**) and ████ 4237 (**TARGET TELEPHONE 5**) to orchestrate his DTO operations. BRIDGERS has a limited criminal history that includes a 2022 arrest for Controlled Dangerous Substances ("CDS") possession with intent for which he received probation before judgement. BRIDGERS is residing at both **THE NICHOLSON PREMISES** and **THE WOODMONT PREMISES**, locations where investigators believe BRIDGERS is storing bulk drug proceeds, as well as firearms. Investigators identified **THE ROCKFIELD PREMISES** as a possible stash house and the residence of BRIDGERS' mother. Investigators previously surveilled BRIDGERS at **THE ROCKFIELD PREMISES** carrying out large quantities of suspected marijuana.

38.     **Huayi ZHONG**: ZHONG, a/k/a "Daniel," is a member of the XU MLO/DTO responsible for receiving marijuana shipments, packaging marijuana, distributing marijuana to customers, and picking up/transporting drug trafficking proceeds in the form of bulk U.S. currency. ZHONG often refers to XU as his "Boss" during intercepted communications and is paid based on the amount of marijuana he transports for XU. ZHONG is the user of **TARGET TELEPHONE 7**.

39.     **Zebin LIU**: LIU, a/k/a "Ben," is a member of the XU MLO/DTO, with the same responsibilities as ZHONG, including receiving marijuana shipments, packaging marijuana, distributing marijuana to customers, and picking up/transporting drug trafficking proceeds in the form of bulk U.S. currency. LIU often refers to XU as his "Boss" and is paid based on the amount of marijuana he transports for XU. LIU is the user of the phone assigned call number ████ 8239.

40.     **Chunbing QIN**: QIN, a/k/a "President Qin," has been identified as a Portland, Oregon, based marijuana supplier for the XU MLO/DTO, as well as a close associate of XU's.

QIN often orchestrates shipments of marijuana to New York and helps direct the transfer of drug trafficking proceeds in the form of bulk U.S. currency from the XU MLO/DTO back to QIN and his associates. QIN is also a known associate of HUYNH, who, as noted above, has been delivering drug trafficking proceeds via FedEx. QIN is the user of the phone assigned call number ████2425.

41.    **Qihai TAO**: TAO has been identified as a Seattle-based marijuana supplier for the XU MLO/DTO and other DTOs across the United States. TAO and his associate, HUANG, work together to obtain bulk quantities of marijuana from different sources and then ship the marijuana in large pallets or crates to destination cities, including Baltimore. TAO also orchestrates the transportation of drug trafficking proceeds to Seattle, often by using "mules" transporting the proceeds in their checked airline luggage. TAO is the user of **TARGET TELEPHONE 11**.

42.    **Peng HUANG**: HUANG, a/k/a "Rio," is a member of the TAO DTO, based out of Seattle, Washington. HUANG is responsible for helping TAO obtain bulk quantities of marijuana, which are then shipped to cities across the United States. HUANG usually flies to the destination cities and oversees the transfer of the marijuana to the TAO DTO's customer(s) in that area. HUANG also obtains drug trafficking proceeds from the DTO's customers and transports the proceeds back to Seattle in his checked airline luggage.

43.    **Isaac HUYNH**: HUYNH, a/k/a "Brother Hua," has been identified as a member of the XU MLO/DTO. HUYNH is responsible for obtaining bulk amounts of drug trafficking proceeds and shipping them, via FedEx, to XU's suppliers. Investigators have seized numerous packages shipped by HUYNH during the course of this investigation, and those packages collectively contained over $650,000 in U.S. currency. HUYNH is the user of the phone assigned call number ████9921.

44. **EMANUEL DUKES, THE SHAWAN PREMISES and THE CLEARVIEW PREMISES**: **DUKES** has been identified as a marijuana supplier for his own Baltimore-based DTO and a secondary supplier for MICKLOS. **THE CLEARVIEW PREMISES** has been identified as DUKES' primary residence as well as a stash house. During surveillance of DUKES, DUKES supplied MACK quantities of marijuana obtained from **THE CLEARVIEW PREMISES** which were then provided to a suspected drug customer. **THE SHAWAN PREMISES** was identified as a secondary stash location. DUKES was previously surveilled returning from New York with a new supply of marijuana and carrying it into **THE SHAWAN PREMISES**. Through an administrative subpoena, investigators learned DUKES' girlfriend, Rebecca Stanley ("STANLEY"), is listed on the utilities bill on **THE CLEARVIEW PREMISES**, specifically the 2nd floor. DUKES has been observed at **THE SHAWAN PREMISES** and **THE CLEARVIEW PREMISES** as recently as August 15, 2024. DUKES has no criminal history. DUKES is the user of telephone device ███████7632.

45. **STEVEN MACK, THE PRESIDENT PREMISES, THE PULASKI PREMISES AND THE TARGET VEHICLE**: MACK has been identified as a member of the DUKES DTO and recently the head of the MICKLOS DTO operating in Baltimore, Maryland. During this investigation, MACK has been seen on surveillance picking up hundreds of pounds of marijuana from Peng HUANG, a source of supply, on behalf of the MICKLOS DTO. MACK then transports the marijuana to **THE PULASKI PREMISES**. MACK has since obtained a secondary stash apartment at the direction of MICKLOS, identified as **THE PRESIDENT PREMISES**. Through as administrative subpoena, investigators learned MACK is the listed tenant of **THE PRESIDENT PREMISES**. MACK frequents both **THE PULASKI PREMISES** and **THE PRESIDENT PREMISES** daily. MACK is also the registered owner of **THE TARGET**

**VEHICLE** which is used to transport bulk supplies of marijuana on behalf of the MICKLOS DTO and the DUKES DTO. MACK is the user of telephone device ███████3862.

46. **OMAR BROWN and THE HUNT RIDGE PREMISES**: BROWN has been identified as a member of the Baltimore based DTO working for MACK. BROWN has been surveilled at two stash locations in Baltimore helping MACK move large amounts of marijuana. BROWN also accompanied MACK to New York to turn over drug proceeds in exchange for a new marijuana supply from the XU MLO/DTO. BROWN is the user of telephone device ███████ 3365 and resides at **THE HUNT RIDGE PREMISES**. BROWN provides **THE HUNT RIDGE PREMISES** as his place of residence on his driver's license. Investigators have conducted surveillance and observed BROWN frequenting **THE HUNT RIDGE PREMISES**.

47. **DAVID HILLIARD and THE SCHERING PREMISES**: HILLIARD is a member of the BRIDGERS DTO who is responsible for conducting marijuana orders on behalf of BRIDGERS. HILLIARD also lives at **THE SCHERING PREMISES** which has been identified as the main stash house used by the BRIDGERS DTO. Once the BRIDGERS DTO obtains a new supply of marijuana from New York, the marijuana is brought directly back to **THE SCHERING PREMISES**. HILLIARD and other DTO members have been observed at **THE SCHERING PREMISES** daily, as recently as September 17, 2024. HILLIARD has a criminal history that includes an arrest for 2nd degree assault. Investigators learned through an administrative subpoena that **THE SCHERING PREMISES** is being leased by Bretta Matthews ("MATTHEWS"), who is believed to be HILLIARD's girlfriend. HILLIARD uses telephone number ███████2852.

48. **DERIAN GREEN and THE EVERGREEN PREMISES**: GREEN has been identified as a courier for the BRIDGERS DTO in Baltimore. GREEN is responsible for transporting bulk drug proceeds from Baltimore to New York and then returning from New York

with marijuana supplies. During these trips, GREEN drives SUV style rental vehicles rented by BRIDGERS. GREEN returns directly to **THE SCHERING PREMISES** to drop off the new marijuana supply. Investigators have identified **THE EVERGREEN PREMISES** as GREEN's residence. GREEN was identified as using telephone device ██████ 8381 which was intercepted communicating with BRIDGERS on numerous occasions. A query of GREEN showed that he does not have a criminal history at this time.

49. **MARCO JONES and THE FORT PREMISES**: JONES was previously identified as a courier for the BRIDGERS DTO operating in Baltimore, Maryland. JONES was responsible for transporting bulk drug proceeds from Baltimore to New York and then returning from New York with marijuana supplies. During these trips, JONES drove his GMC Denali SUV which investigators had a court authorized GPS device affixed to. Investigators intercepted JONES using ██████ 6556 (**TARGET TELEPHONE 3**) to communicate his illegal activities. Agents identified **THE FORT PREMISES** as JONES's residence. JONES has a criminal history that includes firearm related charges.

### D. **MALIK BRIDGERS and the ROCKFIELD PREMISES, the WOODMONT PREMISES and the NICHOLSON PREMISES**

50. Early in this investigation, agents learned that BRIDGERS was residing in the Washington, D.C. area. Investigators also learned that BRIDGERS was storing large amounts of drug proceeds within his residence, described below, and that he was operating as part of the Baltimore-based contingent of the MICKLOS DTO.

51. For example, on March 7, 2024, investigators in New York were surveilling YuGang Weng ("WENG"), who investigators had recently identified as a marijuana supplier for BRIDGERS. On that date, WENG began traveling from New York in a southbound direction and

was eventually followed to Washington D.C. At approximately 9:22 p.m., WENG pulled curbside outside of "The Hartley Apartments[3]" at 7150 12th Street, Washington, D.C. Moments later, BRIDGERS exited the apartment building carrying a cardboard box. As BRIDGERS walked towards WENG, WENG exited his vehicle and removed a multicolored bag from the trunk and handed it to BRIDGERS in exchange for the box. WENG then placed the box into the trunk.

52.     Suspecting that they had just observed a drug transaction, agents approached BRIDGERS and WENG. As agents approached, BRIDGERS dropped the bag. Agents identified themselves and began speaking with BRIDGERS and WENG. WENG immediately stated he did not speak English and BRIDGERS denied knowing WENG and advised the multicolored bag did not belong to him. Investigators informed BRIDGERS that they watched him carry the box out of the building and give it to WENG in exchange for the bag. BRIDGERS stated, "I don't know what you're talking about. That bag isn't mine." WENG also denied ownership of the bag. A search of the bag resulted in the recovery of approximately six bags of suspected marijuana, weighing approximately 1 pound each.

53.     Although WENG initially claimed he could not speak English, WENG gave agents consent to search his vehicle, unlocking it with his key fob. Agents located the box, given to WENG by BRIDGERS, inside the trunk. The box was partially opened, and agents could see large amounts of cash located in the box. WENG denied ownership or any knowledge of the box and gave consent for agents to search the box. Located in the box was over $170,000. The cash was organized in bundles wrapped with rubber bands consistent with, based on my training and experience, how bulk U.S. currency is often packaged by drug traffickers.

---

[3] Agents later learned from an administrative subpoena that BRIDGERS was residing at The Hartley Apartments with his girlfriend. GPS locators also placed BRIDGERS at this residence during the overnight hours on a daily basis until he moved to **THE NICHOLSON PREMISES.**

54.     As the investigation continued, investigators intercepted calls revealing BRIDGERS was continuing to use his residence, at the time The Hartley Apartments, to stash large amounts of drug proceeds and even firearms.  Investigators also obtained surveillance footage from the Hartley apartments that showed BRIDGERS arriving with bags containing suspected drug proceeds that he obtained from **THE SCHERING PREMISES**.

55.     For example, on March 30, 2024, a DTO member was observed arriving at **THE SCHERING PREMISES** carrying a pink and blue bookbag (containing suspected drug proceeds).  Later this same day, BRIDGERS left **THE SCHERING PREMISES** with the bookbag and returned home, entering the Hartley apartment with the same bag, depicted below in the red circles.



56.     On several occasions, investigators have surveilled the BRIDGERS DTO obtaining large supplies of marijuana in New York and returning to Baltimore, then unloading the marijuana into **THE SCHERING PREMISES**.  The DTO then would obtain quantities of marijuana from **THE SCHERING PREMISES**, as needed.  Agents have observed members of the DTO, such as BRIDGERS and HILLIARD at this location as recently as September 17, 2024.

57.     During the course of the investigation, DEA determined that BRIDGERS often utilizes his residence and other premises for storing bulk U.S. currency or controlled substances.

For example, on April 22, 2024, at approximately 8:14 p.m., BRIDGERS received a call from ███ ███5982, used by an unknown female ("UF") believed to be BRIDGERS' girlfriend. During the call, BRIDGERS asked the UF if she was *near the house* and UF acknowledged. BRIDGERS went on to ask, "Can you meet Peanut?"[4] UF asked, "Meet Peanut where?" BRIDGERS replied, "Somewhere out that way." UF replied, "I didn't even count no money." UF then asked, "So am I meeting Peanut to get more money or I'm meeting him to give him money?" BRIDGERS replied, "Get more." The UF acknowledged, and BRIDGERS then asked, "Why you ain't count nothing?" UF informed, "Cause you didn't tell me when to count." BRIDGERS replied, "Alright, we'll just do it when I get there."

58. Based on law enforcement's knowledge and experience with the investigation, it was believed that in this call BRIDGERS was directing his girlfriend, who was at their residence (a residence he has since moved from and is not a subject of any proposed search pursuant to this affidavit), to pick up drug proceeds from "Peanut" (a/k/a GREEN) and bring it back to their residence. Investigators believe BRIDGERS went on to ask why the UF had not counted the drug proceeds inside their residence ("why you ain't counting") but later agreed they would count it later, "Alright, we'll just do it when I get there."

59. Since that call, investigators learned BRIDGERS moved to **THE NICHOLSON PREMISES** on May 6, 2024. Investigators learned from an administrative subpoena that BRIDGERS's name was on the leasing agreement. Investigators have observed GPS locators from BRIDGERS's phone regularly remains in the area of **THE NICHOLSON PREMISES** during the overnight hours, as recently as September 17, 2024. Investigators believe that, although

---

[4] Peanut was later identified during the investigation as GREEN.

BRIDGERS may sleep at **THE WOODMONT PREMISES** from time to time, BRIDGERS primarily resides at **THE NICHOLSON PREMISES**.

60.     Based on the above knowledge that BRIDGERS was keeping large amounts of drug proceeds in his residence, and knowing BRIDGERS is still operating a multimillion-dollar marijuana distribution network, investigators believe BRIDGERS continues to use his residence, **THE NICHOLSON PREMISES**, to store large amounts of drug proceeds.

61.     On July 17, 2024, BRIDGERS obtained a large brown bag from GREEN, believed to contain drug proceeds, and hid it in his van before leaving. Investigators believe BRIDGERS likely returned to **THE NICHOLSON PREMISES** with the drug proceeds.

62.     Investigators have also identified **THE WOODMONT PREMISES** as a likely secondary stash house frequented by BRIDGERS.  Investigators have observed GPS locators from his telephone device, ████████ 4197, frequenting the vicinity of this location during overnight hours and daytime hours.

63.     During the course of this investigation, BRIDGERS has been associated with **THE ROCKFIELD PREMISES**.  Investigators initially identified this location during the seizure of the box containing over $170,000 from BRIDGERS and WENG.  On the box, a shipping label was observed with BRIDGERS' name and **THE ROCKFIELD PREMISES** listed on the box. Furthermore, BRIDGERS lists **THE ROCKFIELD PREMISES** as his place of residence through the Maryland Motor Vehicle Administration.

64.     Although investigators believe **THE ROCKFIELD PREMISES** is a family member's house, specifically BRIDGERS' mother's house, investigators have learned that BRIDGERS visits this location on a consistent basis and have observed BRIDGERS using the location as a suspected alternate stash house.

65.     For example, on April 14, 2024, investigators learned from GPS locators on BRIDGERS's telephone device that he was near **THE ROCKFIELD PREMISES**. Investigators set up surveillance at the location and observed BRIDGERS coming and going from **THE ROCKFIELD PREMISES**. As BRIDGERS was exiting the location, BRIDGERS was observed carrying a large bag and cardboard box, similar to the bags observed at **THE SCHERING PREMISES** used by the DTO to carry large amounts of marijuana, depicted below in the red circle.



66.     More recently, on September 16, 2024, GPS locators from BRIDGERS' phone showed he left the area of **THE SCHERING PREMISES** (stash house) and went to the area of **THE ROCKFIELD PREMISES**, staying for less than thirty minutes. BRIDGERS then left and travelled to the area of **THE WOODMONT PREMISES**.

67.     Based on these observations, coupled with the fact BRIDGERS is still engaged in his drug trafficking activity, investigators believe BRIDGERS uses **THE ROCKFIELD PREMISES** as an alternate stash location while also utilizing **THE NICHOLSON PREMISES**, his current primary residence, to store, *inter alia*, drug proceeds, marijuana and other paraphernalia associated with drug distribution.

68.     Most importantly, investigators have observed telephonic GPS locators showing BRIDGERS travels between **THE NICHOLSON PREMISES**, **THE SCHERING PREMISES** and **THE WOODMONT PREMISES**.  Investigators believe he is likely moving drug proceeds.

69.     For example, on August 14, 2024, at approximately 7 a.m., telephonic GPS locators showed BRIDGERS in the vicinity of **THE NICHOLSON PREMISES**.  Telephonic GPS locators then showed BRIDGERS travelled to the vicinity of **THE WOODMONT PREMISES** and then the vicinity of **THE SHERING PREMISES**.  Investigators observed BRIDGERS arrive at **THE SCHERING PREMISES** operating a silver minivan.  Later this day, BRIDGERS climbed into the back seat of the minivan alone and closed the door.  At approximately 12:20 p.m., GREEN (an identified drug and bulk U.S. currency courier) left the area operating the minivan. Based on intercepted communications, coupled with GPS location data from GREEN's telephone device, investigators know GREEN travelled to New York to obtain a new marijuana supply.

70.     Based upon investigators' knowledge and experience, investigators believe BRIDGERS obtained drug proceeds from **THE NICHOLSON PREMISES** and **THE WOODMONT PREMISES** and transported them to **THE NICHOLSON PREMISES** where he kept them in the minivan.  Based on intercepted communications, coupled with GPS location data from GREEN's telephone device investigators believe GREEN then transported the proceeds to New York to obtain a new marijuana supply.

71.     On September 3, 2024, at approximately 6:53 p.m., BRIDGERS left **THE SCHERING PREMISES** carrying a weighted bag (suspected drug proceeds), which he placed in the back seat of a Chevy SUV before leaving.  GPS locators from BRIDGERS' telephone device showed that he travelled to **THE WOODMONT PREMISES**.

72.     Based on this information, investigators suspect BRIDGERS left **THE SCHERING PREMISES** with a bag of drug proceeds and transported them to **THE WOODMONT PREMISES**.

73.     Most recently, on September 6, 2024, investigators learned from intercepted communications that the BRIDGERS DTO would be obtaining a new supply of marijuana from the XU MLO/DTO in New York.  Specifically, investigators intercepted a call from XU to BRIDGERS.  During the conversation, BRIDGERS told XU, "Be there at like 1 o'clock."  At approximately 10:30 a.m., telephonic GPS locators showed that BRIDGERS was near **THE WOODMONT PREMISES**.  Telephonic GPS locators then showed BRIDGERS travelled to Columbia, Maryland. As this occurred, GPS locators from GREEN's telephone showed he left Baltimore and travelled to the same area as BRIDGERS in Columbia, Maryland.  GPS locators then showed GREEN travelled to New York.

74.     Based on this information, investigators believe BRIDGERS obtained drug proceeds from **THE WOODMONT PREMISES** and gave them to GREEN while in Columbia, Maryland which GREEN then transported to New York.  Investigators also believe BRIDGERS swapped cars with GREEN providing him with a rental SUV, as they always do.

75.     On September 16, 2024, investigators intercepted communications between BRIDGERS and XU.  During the call, BRIDGERS asked, "Tomorrow?"  XU replied, "Yeah, yeah, about nighttime."  BRIDGERS asked, "So don't send my boy over early?"  XU replied, "Yeah, don't go early, we will be at the night."  Based on this call, agents believe BRIDGERS would be sending bulk U.S. currency in the form of drug proceeds, via GREEN ("my boy"), to New York in the near future in exchange for a new supply of marijuana.

76.     On September 17, 2024, agents monitored telephonic GPS data which led them to believe GREEN and BRIDGERS had met in person.  Agents ultimately located GREEN, who acts as BRIDGERS' drug and bulk U.S. currency courier, traveling northbound on interstate 95 driving a rental vehicle, leased by BRIDGERS.  Knowing GREEN was transporting money to New York, agents directed law enforcement—in this case a Maryland State Trooper—to conduct a vehicle stop on GREEN.  Agents ultimately seized a box containing approximately $250,000-$300,000 in bulk U.S. currency:



77.     Investigators know BRIDGERS is on the leasing agreement for **THE WOODMONT PREMISES** and that the lease does not expire until August 2025.  Investigators also learned BRIDGERS is on the utility bill associated to **THE WOODMONT PREMISES** and has been since approximately May 2024.

78.     Investigators believe evidence of BRIDGERS' drug trafficking and money laundering, such as drug proceeds, drug ledgers, scales, and other paraphernalia will be located

inside **THE NICHOLSON PREMISES** and **THE WOODMONT PREMISES**. Investigators also believe that, based upon GPS data, BRIDGERS' telephone devices, specifically **TARGET TELEPHONES 4** and **5**, will be located in either **THE NICHOLSON PREMISES** and/or **THE WOODMONT PREMISES**.

### E.  **EMANUEL DUKES, the SHAWAN, and the CLEARVIEW PREMISES**

79.     As part of this investigation, and as stated through this affidavit, investigators identified DUKES (a/k/a "Rich") as an alternate source of supply for MICKLOS. Investigators also learned that DUKES is operating his own marijuana distribution network in Baltimore, along with MACK (a/k/a "Gustavo") and has his own New York-based sources of supply.

80.     Investigators have identified **THE CLEARVIEW PREMISES** as DUKES' primary residence as well as a suspected stash location. Investigators also know **THE SHAWAN PREMISES** is an alternate stash location used by DUKES.

81.     During the initial identification of DUKES, investigators intercepted DUKES, using telephone device ████7632, communicating with MICKLOS. During those conversations, which took place on May 20th, 21st and 22nd, MICKLOS discussed obtaining various strains of marijuana from "Rich", and discussed how the transfer of money for the marijuana would occur.

82.     On May 22, 2024, at 11:28 a.m., MICKLOS called DUKES. At one point, MICKLOS asked, "Yeah what you…What the fuck you say happen?" DUKES replied, "Uh... just somebody was asking me to do a favor for em, uh… like make sure, like pick something from their spot cuz his…you know… people were getting raided, or something like that."

83.     On May 22, 2024, at 2:05 p.m. MICKLOS called DUKES. MICKLOS stated, "Damn bro. I know what you were talking about now. I just saw it on Baltimore Uncut. Or

Baltimore whatever." Investigators were aware that MICKLOS was referring to an Instagram page that posts news clips, to include significant arrests in the Baltimore region. MICKLOS began to make comments about what was seized, to include firearms. As the conversation progressed, DUKES asked MICKLOS, "Where'd you see it yo?" referencing the social media post detailing the seizure. MICKLOS directed DUKES to the BPD Instagram page. DUKES eventually located the social media post and stated, "Oh my God." The conversation continued, with MICKLOS describing the firearms, jewelry, and marijuana seized. MICKLOS described the extended magazines and weapon types.

84. Equipped with this information, investigators searched the BPD's Instagram site, which is available for public viewing. Investigators located a post from May 22, 2024, that described a series of search and seizure warrants executed in the Southern District section of Baltimore City. The post included the images that matched the description of the items MICKLOS described and DUKES acknowledged (see below).





85.     During the conversation regarding the seizure by BPD, MICKLOS stated "Damn bro. That sucks. I know how that.. fucking…I know how that shit feels. Like maybe not that, but just like, losing everything. Your man getting booked and all that. You like damn. Like, it's good that you grabbed everything for him but fuck. Damn that sucks." DUKES then replied "Yeah… for everything so.." Based on this call, in conjunction with investigators' knowledge and experience, it was believed that the subjects arrested and the property seized in the incident were part of DUKES's trafficking organization, and that DUKES took an active role in concealing additional evidence not yet identified by BPD investigators.

86.     As MICKLOS and DUKES continued to communicate over intercepted communications about how DUKES would help supply MICKLOS' Baltimore DTO with marijuana, investigators began further investigating DUKES.

87.     For example, on June 4, 2024, at approximately 2:36 p.m., MICKLOS received a call from ███████ 7632, the same phone previously used by DUKES.  During this call, MICKLOS told DUKES, "Um, ya 'bout to go get more shit too?"  DUKES said, "Yeah. I'm workin' on it."  MICKLOS asks, "I'm sayin' you, uh ... you in Baltimore or you in New York?"  DUKES said, "I'm still in um, New York."  MICKLOS said, "Oh, you're workin' on getting' more now.  Okay.  Did, uh... did you send everything over to Baltimore yet, so that I can start sellin' it tomorrow? I haven't looked at everything yet, but ya know that's somethin' I do a lot."  DUKES responded, "It should be there by tomorrow." MICKLOS asked, "Oh, it's not there now?" DUKES told MICKLOS, "Yeah. Just tell me what you think 'bout everything."

88.     Based upon investigators' knowledge and experience, investigators believe MICKLOS asked DUKES if he would be obtaining a new supply of marijuana in the near future, "ya 'bout to go get more shit too?"  Investigators believe DUKES was in New York during the call working on obtaining that new supply of marijuana, "I'm still in um, New York."  Investigators believe DUKES told MICKLOS the new supply would be in Baltimore the following day, "It should be there by tomorrow."

89.     Additionally, on June 5, 2024, investigators were monitoring court-authorized GPS locators from DUKES' telephone device.  Investigators learned DUKES was returning from New York and heading towards **THE SHAWAN PREMISES**.  Investigators set up surveillance near **THE SHAWAN PREMISES** anticipating DUKES would arrive with a new supply of marijuana.  Investigators observed DUKES arrive operating **THE TARGET VEHICLE** and park in the parking garage.  DUKES and his girlfriend STANLEY then proceeded to unload numerous large, weighted bags (containing suspected marijuana) from **THE TARGET VEHICLE** and carry them into the apartment building of **THE SHAWAN PREMISES**, depicted in the red circles below.





As investigators terminated this surveillance and were leaving the parking garage, MACK was observed entering the parking garage driving his Tesla.

90.     On June 9, 2024, at approximately 8:38 p.m., MICKLOS called ███████7632, the same number previously used by DUKES.  During this call DUKES said, "What it do?"  MICKLOS responded, "Sup Brodie. I did all that math of the profit I made the first (1st) go 'round, it's in my other phone though.  Um, what was I about to say though.  Uh, do you know when you getting' a new shit?"  DUKES said, "Uh, tomorrow, today type shit."  MICKLOS said, "Alright, alright yeah, just let me know."  DUKES said, "Alright."

91.     Based upon investigators' knowledge and experience, investigators know DUKES and MACK were running MICKLOS's Baltimore-based DTO.  Investigators believe MICKLOS called DUKES to inform that MICKLOS knew the total amount of profit he made from marijuana sales ("I did all that math of the profit I made") and asked DUKES when he would be getting a new supply of marijuana, "do you know when you getting' new shit?"  Investigators believe DUKES informed he would have a new supply either this day or the following, "tomorrow, today type shit."

92.     Since then, investigators know DUKES has frequented **THE SHAWAN PREMISES** as recently as September 16, 2024.  Investigators used an administrative subpoena and learned DUKES is listed on the utilities account for **THE SHAWAN PREMISES**. Investigators believe DUKES is using **THE SHAWAN PREMISES** as a stash location to store large amounts of bulk marijuana and drug proceeds.

93.     Investigators have also learned that DUKES is using his residence, **THE CLEARVIEW PREMISES**, as an alternate stash house.  On August 28, 2024, investigators observed DUKES leave **THE CLEARVIEW PREMISES** carrying a large, weighted bag (suspected drug proceeds) and travel to New York in **THE TARGET VEHICLE**.  Once there, DUKES met with an Asian marijuana supplier and obtained a supply of marijuana in exchange for drug proceeds which were believed to be in the bag carried out of **THE CLEARVIEW PREMISES**.

F.  **THE PRESIDENT PREMISES, THE PULASKI PREMISES, THE HUNT RIDGE PREMISES, AND THE TARGET VEHICLE**

94.     Investigators have identified MACK (a/k/a "Gustavo") as a member of the DUKES DTO and the new leader of the MICKLOS DTO.  MACK is responsible for organizing marijuana

sales of customers in Baltimore and then collecting drug proceeds. MACK was recruited by MICKLOS following the arrest of TILMON in May 2024.

95.     Since this time, investigators have intercepted MACK communicating with MICKLOS orchestrating the DTO operations, discussing marijuana sales, profits made by the DTO, marijuana inventory and the transportation of drug proceeds back to New York. MACK and MICKLOS also agreed that MICKLOS would pay MACK approximately $20,000 a month for his role within the DTO.

96.     For example, as recently as July 8, 2024, at approximately 9:53 p.m., **TARGET TELEPHONE 12** called ████3862, utilized by MACK. MICKLOS began the conversation by saying, "Brodie." MACK asked, "Yeah, what going on?" MICKLOS asked, "What's up bro. You know how much money you uh…you gave me?" MACK stated, "Um…let me check 'cause whatever number that uh…Veen sent you probably minus two hundred. But, I sectioned everything off into denominations, so it should be pretty easy to count." MICKLOS responded, "(Inaudible) denominations of what, ten thousand?" MACK stated, "Uh…nah, everything is like a hundred bills. So, like a hundred bills of twenty is uh…two thousand, so everything should be pretty easy to count like that." MICKLOS asked, "Uh…what do you mean a hundred bills?" MACK replied, "So, like every rubber band is a hundred bills. So, like a hundred two, a hundred twenty's is like two thousand, a hundred tens is a thousand, a hundred hundreds is ten thousand." MICKLOS asked, "Did you, did you the…did you text the amount to Veen what you gave me?" MACK replied, "Veen should know…like Veen's total amount that he put for the day, if what it should be. So…" MICKLOS interrupted, "[U/I]." MACK continued, "…I'm 'bout to just look at the messages on what the last total amount was." MICKLOS responded, "Uh…three fifty five o three five." MACK replied, "Yeah, minus two hundred." MICKLOS asked, "D…oh…Didn't you

say you put extra money in them?"  MACK stated, "Nah, I said I took two hundred out today for a rental."  MICKLOS asked, "Oh, I thought you said today that you put extra money in?"  MACK acknowledged, "Nah."  MICKLOS responded, "Okay, alright cool.  So, it's three fifty five o thirty five minus two hundred?"  MACK replied, "Yeah."  MICKLOS advised, "Perfect.  Okay, alright bet. Thanks Brodie."  MACK stated, "No problem."  MICKLOS replied, "Alright Brodie."  MACK replied, "Alright."  MICKLOS ended the call, "Let me know too about those other."

97.    Based upon investigators' knowledge and experience, investigators believe MICKLOS had recently met with MACK in Baltimore to pick up drug proceeds.  Investigators know from GPS data from MACK's and MICKLOS' telephone devices that they were in the same area in Baltimore on July 8, 2024, for a short period of time.  Investigators believe MICKLOS called MACK and asked for the total amount of money he had given MICKLOS, "You know how much money you uh…you gave me?"  Investigators believe MACK informed he had given $354,835, "So, it's three fifty five o thirty five minus two hundred?" and "minus two hundred."

98.    On July 17, 2024, at approximately 10:52 a.m., **TARGET TELEPHONE 12** called ███3862, previously used by MACK. During the call, MICKLOS asked, "Um…you said it's one hundred and ten?" MACK replied, "That I got for you, yes. I still didn't count everything from yesterday if you needed more or something." MACK then stated, "I got at least another twenty five thousand coming today." MICKLOS asked, "You said another twenty five?" MACK replied, "Uh yeah cause there's another two big orders..."

99.    Based upon investigators' knowledge and experience, investigators believe MICKLOS asked MACK if he had $100,000 in drug proceeds, "you said it's one hundred and ten?"  Investigators believe MACK confirmed and stated he had even more but had not counted the additional proceeds from the marijuana sales the dale before, "That I got for you, yes. I still

didn't count everything from yesterday if you needed more or something." Investigators also believe MACK informed he would have an additional $25,000 later on, as he had two big marijuana sales scheduled, "I got at least another twenty five thousand coming today."

100. Not only have agents intercepted communications with MACK, but they have also conducted surveillance of MACK in Baltimore engaged in drug trafficking activity related to the MICKLOS DTO and identified **THE PULASKI PREMISES** and **THE PRESIDENT PREMISES** as locations used to stash drugs and drug proceeds.

101. For example, in June 2024, investigators learned that MICKLOS's supplier, XU, was orchestrating a large shipment of marijuana to be delivered to Baltimore from Seattle. Investigators learned the shipment had arrived on June 24, 2024. Investigators surveilled MACK and observed him picking up a U-Haul truck from HUANG.[5] MACK drove the truck to **THE PULASKI PREMISES** and proceeded to unload multiple cardboard boxes, believed to contain hundreds of pounds of marijuana, with the help of an unknown associate as depicted in the red circles below. MACK then returned the U-Haul truck to HUANG.



---

[5] HUANG is a member of the TAO DTO operating out of Seattle. HUANG flew to Baltimore from Seattle to oversee the delivery of the marijuana shipment to MICKLOS' DTO members.

102.    On July 18, 2024, investigators learned another large shipment of suspected marijuana arrived from Seattle for the MICKLOS DTO.  Again, MACK picked up a U-Haul truck from unidentified Asian associates of HUANG and TAO and drove it to **THE PULASKI PREMISES**.  MACK unloaded the boxes, believed to contain hundreds of pounds of marijuana, into **THE PULASKI PREMISES** and then returned the U-Haul to the Asian males.



103.    On this same date, at approximately 12:44 p.m., MACK and BROWN, a known DTO member, loaded multiple boxes from **THE PULASKI PREMISES** into **THE TARGET VEHICLE** and then left together.  GPS location data from **THE TARGET VEHICLE** showed MACK, along with BROWN, drove to **THE PULASKI PREMISES**, where investigators believe they unloaded the boxes of suspected marijuana.



104.  On July 31, 2024, MACK and BROWN returned from New York in **THE TARGET VEHICLE** after meeting with the XU MLO/DTO and delivering drug proceeds in exchange for a new marijuana supply on behalf of MICKLOS. MACK and BROWN proceeded to unload approximately 14 large, weighted bags (suspected marijuana) into **THE PRESIDENT PREMISES**.

105.  On August 7, 2024, MACK again returned from New York in **THE TARGET VEHICLE** after meeting with the XU MLO/DTO and delivering drug proceeds in exchange for a new marijuana supply on behalf of MICKLOS. MACK proceeded to unload approximately 12 large, weighted trash bags (suspected marijuana) into **THE PRESIDENT PREMISES**.



106.   As stated before, investigators know MACK is leasing **THE PRESIDENT PREMISES** under his name.  MACK acquired **THE PRESIDENT PREMISES** after agreeing with MICKLOS to obtain a second stash location so that drug proceeds and large quantities of marijuana would not all be in the same location.  Investigators also know from GPS location data from both **THE TARGET VEHICLE** and MACK's telephone device that MACK frequents both **THE PULASKI PREMISES** and **THE PRESIDENT STREET PREMISES** daily.  Investigators have observed MACK at **THE PRESIDENT PREMISES** and **THE PULASKI PREMISES** as recently as August 13, 2024.

107.   On August 17, 2024, at approximately 12:09 p.m., MICKLOS, utilizing **TARGET TELEPHONE 12**, called 240-779-3365, used by BROWN.  During the call, BROWN informed MICKLOS that he was in "Philly."  BROWN then informed that MACK, "left me to take care of everything.  Shit going smooth though.  All the orders have been bagged and um, sent out with drivers.  We are down a driver today so I'm doing bagging and driving."  MICKLOS acknowledged and ultimately directed BROWN to call if he (BROWN) needed anything.

108. Based on the above call, investigators believe BROWN is in fact a member of the DTO, is familiar with how the DTO operates and was left in charge of running the Baltimore-based DTO on behalf of MACK while MACK was out of town.

109. Furthermore, investigators know BROWN's telephone device is subscribed to a "Patti Taylor" at 6006 Hunt Ridge Road, Apt 2521, Baltimore, Maryland (**THE HUNT RIDGE PREMISES**). Investigators know BROWN provides **THE HUNT RIDGE PREMISES** as his residence such as on his driver's license.

110. On August 20, 2024, investigators conducted video surveillance and observed BROWN arrive at **THE HUNT RIDGE PREMISES** operating a Subaru registered to a "Caroline Taylor" at **THE HUNT RIDGE PREMISES**. BROWN entered the apartment building carrying a black duffle bag. Investigators believe BROWN is in fact residing at **THE HUNT RIDGE PREMISES**.

111. On August 28, 2024, at approximately 2:04 p.m., agents observed MACK, via covert camera,[6] exit **THE PRESIDENT PREMISES** carrying a large carboard box and brown laundry-type bag. Moments later, MACK returned empty handed.

112. At approximately 2:09 p.m., MACK exited **THE PRESIDENT PREMISES** with a cardboard box labeled "TRANSWORLD".

113. At approximately 2:31 p.m., agents, via covert camera,[7] observed Omar BROWN arrive at **THE HUNT RIDGE PREMISES** operating a green Subaru. BROWN then removed a cardboard box from the trunk and entered the apartment building. Moments later, BROWN exited the apartment building and removed another cardboard box labeled "TRANSWORLD" and a

---

[6] Agents installed this camera on or about July 29, 2024.

[7] Agents installed this camera on or about June 25, 2024.

brown laundry-type bag. BROWN entered the apartment building to **THE HUNT RIDGE PREMISES** with the box and bag.



114. Investigators know from surveillance, the "TRANSWORLD" boxes are boxes previously shipped to Maryland from Seattle by TAO and HUANG. These boxes were then picked up on August 15, 2024, by MACK and unloaded into **THE PRESIDENT PREMISES**. The boxes were picked up by MACK and are suspected to contain hundreds of pounds of marijuana. Investigators believe MACK removed the above bags and boxes, believed to contain marijuana, from **THE PRESIDENT PREMISES** and gave them to BROWN who then transported them to **THE HUNT RIDGE PREMISES.**

115. On September 12, 2024, DUKES was surveilled as he travelled to New York to obtain a new supply of marijuana and returned the following day. DUKES and MACK then unloaded over fifteen large, weighted bags (suspected marijuana) from **THE TARGET VEHICLE** and carried it into **THE PRESIDENT PREMISES**.

116.    Based upon my knowledge and experience, I believe **THE PULASKI PREMISES**, **THE PRESIDENT PREMISES**, and **THE HUNT RIDGE PREMISES** will possess evidence of drug trafficking and money laundering, such as marijuana, drug proceeds, drug and money ledgers, scales, packaging materials, firearms, electronic devices (such as telephone devices associated with phone numbers ████3862 and ████3365) and other evidence of drug trafficking.

G. **THE SCHERING PREMISES, THE EVERGREEN PREMISES, THE FORT PREMISES**

117.    As mentioned above, investigators learned that the BRIDGERS DTO uses the **SCHERING PREMISES** as their stash location.  Investigators initially identified this location on March 15, 2024, through telephonic GPS data from JONES, BRIDGERS's previous courier.  An administrative subpoena delivered to property management revealed **THE SCHERING PREMISES** is being leased by MATTHEWS, believed to be HILLIARD's girlfriend.  HILLIARD also lives at **THE SCHERING LOCATION** and has been observed frequenting this location daily.

118.    On March 15, 2024, investigators monitored GPS data from JONES' GMC SUV which traveled to a storage unit used by BRIDGERS where investigators believe JONES picked up a large supply of drug proceeds from BRIDGERS.  JONES then travelled directly to New York.  While in New York, telephonic GPS data showed JONES stopped at a stash location, used by the XU MLO/DTO, for less than ten minutes.  GPS data then showed JONES returned from New York and traveled directly to the rear of **THE SCHERING PREMISES**.

119.    Based on that information and their knowledge and experience, investigators believe that JONES likely picked up drug proceeds from BRIDGERS while at the storage facility,

transported them to XU, picked up a new supply of marijuana and then returned to Baltimore, dropping the new marijuana supply off at **THE SCHERING PREMISES**.

120. Investigators then installed a covert camera to surveil this location and learned the DTO was using "5961" Schering Road (**THE SCHERING PREMISES**).

121. Since March 2024, investigators have maintained surveillance on this location. On a daily basis, HILLIARD and other DTO members meet at **THE SCHERING PREMISES**. HILLIARD and the DTO members then leave with smaller bags which investigators believe contain marijuana. HILLIARD and the DTO members later return without the bag(s) or a small bag which investigators believe contain drug proceeds.

122. For example, on June 8, 2024, at approximately 12:26 p.m., HILLIARD exited the rear of **THE SCHERING PREMISES** carrying a large, weighted trash bag (suspected marijuana) as depicted in the red circle below.



HILLIARD placed the bag into an SUV and left, accompanied by a DTO member.

123.     At approximately 2:01 p.m., HILLIARD and another DTO member exited **THE SCHERING LOCATION** carrying large black bags (suspected marijuana) as depicted in the red circle below.



The bags were then placed into a blue Lexus (suspected drug customer) which was parked in the alleyway. Moments later, another DTO member brought a third bag (suspected marijuana) out of **THE SCHERING PREMISES** and gave it to the driver of the Lexus. The Lexus then left.

124.     On July 8, 2024, at approximately 12:13 p.m., a Chevy sedan (suspected drug customer) arrived in the alleyway. Moments later, a DTO member exited **THE SCHERING LOCATION** carrying a large yellow bag (suspected marijuana) as depicted in the red circle below.



The DTO member placed the bag into the Chevy's rear seat.

125.     As stated before, investigators have also observed new supplies of marijuana being delivered to **THE SCHERING PREMISES** after being picked up in New York.

126.     For example, as recently as July 14, 2024, video surveillance showed GREEN arriving at **THE SCHERING PREMISES**.  While there, HILLIARD arrived in a white SUV and ultimately met with GREEN.  GREEN then left in the white SUV and HILLIARD entered **THE SCHERING PREMISES**.  Later that evening, investigators intercepted communications over **TARGET TELEPHONE 6** between BRIDGERS and XU.   During those conversations, BRIDGERS told XU "his guy" was waiting for XU's guy, leading investigators to believe GREEN travelled to New York for a resupply on behalf of BRIDGERS.

127.     That night, at approximately 10:10 p.m., XU received a call from ▮▮▮▮4197, used by BRIDGERS.  During the call, BRIDGERS asked, "Yo, you get it?"  XU replied, "I… I think so.  They… they should be done, right now."  BRIDGERS stated, "Alright, I still owe you for… uh… that is all the money that I owe you except for like seventeen (17) PK."  XU asked,

"How much is there?" BRIDGERS informed, "Huh… … I ain't gonna lie, I got to check when I get back home. It is like four (4) something though." XU stated, "You should send me the tab. I send you a (inaudible)." BRIDGERS acknowledged, "Yeah. It is a lot though." XU acknowledged, and the call ended.

128. Based upon investigators' knowledge and experience, investigators believe BRIDGERS had sent GREEN to New York to pick up a new supply of marijuana from the XU and simultaneously provide the XU MLO/DTO with drug proceeds. Investigators believe XU asked BRIDGERS how much money they gave ("How much is there?") to which BRIDGERS responded that it was approximately $400,000, "It is like four (4) something…".

129. Suspecting GREEN would be returning to **THE SCHERING PREMISES** with the new supply of marijuana, investigators began reviewing covert video footage. At approximately 1:04 a.m., GREEN returned to **THE SCHERING PREMISES** driving the white SUV. GREEN then unloaded approximately ten large, weighted bags (suspected marijuana) from the Chevy SUV and carried them into **THE SCHERING PREMISES**.

130. Furthermore, investigators have observed BRIDGERS frequenting **THE SCHERING PREMISES**. BRIDGERS often enters the rear of the location and remains inside for hours at a time. Investigators believe BRIDGERS, who controls the DTO phone which receives marijuana orders from customers, stays inside **THE SCHERING PREMISES** preparing marijuana orders.

131. For example, on March 21, 2024, at approximately 4:22 p.m., BRIDGERS and HILLIARD exited **THE SCHERING LOCATION**, both carrying large, weighted bags (suspected marijuana) and placed them inside of HILLIARD's Honda as depicted in the red circle below.



HILLIARD then left, and BRIDGERS walked back inside.

132.    At approximately 4:58 p.m., BRIDGERS exited carrying two large, weighted bags (suspected marijuana) and placed them inside GREEN's Toyota sedan as depicted in the red circle below.



BRIDGERS then went back inside, and GREEN left in the Toyota.

133.     At approximately 6:03 p.m., BRIDGERS exited **THE SCHERING PREMISES** carrying a large, weighted bag (suspected marijuana) and placed it into his rental vehicle as depicted in the red circle below.



134.     A few minutes later, GREEN returned, and BRIDGERS removed the bag (suspected marijuana) from his SUV and placed it into GREEN's Toyota.  In turn, GREEN handed BRIDGERS a shoe box (suspected drug trafficking proceeds) which BRIDGERS placed into his rental vehicle.  GREEN then left, as did BRIDGERS.

135.     Based on investigators' knowledge and experience, investigators believe BRIDGERS had prepared large marijuana orders while inside **THE SCHERING PREMISES**. Investigators believe those orders were then taken out in the aforementioned bags, placed into HILLIARD and GREEN's vehicles, and then sold to the customers by HILLIARD and GREEN. Investigators believe GREEN then returned and provided BRIDGERS drug proceed which were containing inside the shoe box.

136.     On April 12, 2024, at approximately 2:16 p.m., BRIDGERS and GREEN exited

**THE SCHERING PREMISES** carrying large bags (suspected marijuana) and placed them into

GREEN's Toyota.  GREEN then left.



137.     At approximately 3:41 p.m., GREEN returned to **THE SCHERING PREMISES**.

GREEN exited his Toyota with a brown bag (suspected drug trafficking proceeds) and entered

BRIDGERS's van, handing BRIDGERS the bag as depicted in the red circle below.



BRIDGERS then appeared to remove money from the bag and hand it to GREEN. GREEN then left. BRIDGERS then proceeded to climb into the rear of his van and appeared to conceal the bag. BRIDGERS then left.

138.    On July 17, 2024, at approximately 11:04 a.m., BRIDGERS exited **THE SCHERING PREMISES** with a large, full bookbag (suspected drug trafficking proceeds). Before leaving the location, BRIDGERS placed the bag into his minivan in such a way that it appeared he was attempting to conceal it behind the seats in the van as depicted in the red circle below.



139.    Via the pole camera, investigators have observed drug distribution-related activity at **THE SCHERING PREMISES**, on a daily basis. Often, BRIDGERS is observed leaving **THE SCHERING PREMISES** with bags which investigators believe contain drug trafficking proceeds. For example, GREEN returned from New York with a new supply of marijuana on September 12, 2024. GREEN then proceeded to carry numerous bags (marijuana) into **THE**

**SCHERING PREMISES**. DTO members, including BRIDGERS, have been observed at **THE SCHERING PREMISES** as recently as September 17, 2024.

140. Based on this information, I believe BRIDGERS, HILLIARD, and other DTO members use **THE SCHERING PREMISES** in furtherance of their drug trafficking, storing bulk quantities of marijuana and drug trafficking proceeds. I believe that evidence of their drug trafficking and money laundering will likely be located inside **THE SCHERING PREMISES**.

141. Investigators have identified **THE EVERGREEN PREMISES** as the residence of GREEN. Investigators also believe **THE EVERGREEN PREMISES** may be a stash location used by GREEN and his associate Dominic Webster ("WEBSTER"). Investigators know WEBSTER was previously investigated for drug trafficking where it was believed that WEBSTER was selling large quantities of marijuana, cocaine, and other drugs.

142. Through surveillance of **THE EVERGREEN PREMISES**, GREEN has been observed residing at this location, parking his car outside the location, and staying during the overnight hours on a near daily basis.

143. Investigators have also conducted surveillance of JONES, a previous courier for the BRIDGERS DTO, at **THE EVERGREEN PREMISES**.

144. On March 7, 2024, investigators monitored GPS data for JONES's GMC Yukon SUV. At approximately 9:58 a.m., JONES' Yukon stopped on Walter Avenue near the intersection of Evergreen Avenue.

145. At approximately 9:58 a.m., JONES utilizing **TARGET TELEPHONE 3** called ███4179, used by WEBSTER. During the ensuing conversation, JONES indicated that "He was outside" and asked WEBSTER to "Bring three cupids."

146. Investigators utilized a covert surveillance camera to make the following observations. At approximately 10:01 a.m., an unknown male ("UM1") in a red sweatsuit exited **THE EVERGREEN PREMISES**. UM1 walked around to the side of the residence and approached JONES's Yukon which was parked on Walther Avenue. UM1 opened the front passenger door of JONES's Yukon and briefly leaned into the vehicle, appearing to interact with the driver. UM1 then stepped back from the vehicle and returned to **THE EVERGREEN PREMISES**, entering the front door. JONES's Yukon drove away from the location a short time later.

147. Although investigators are unaware of the exact meaning of "three cupids" investigators believe, based on their knowledge and experience with this investigation, that this is an amount of drugs. Investigators believe WEBSTER, GREEN's associate, brought those drugs out to JONES during the above surveillance.

148. Agents conducted a check of **THE EVERGREEN PREMISES** in police databases. The check revealed that an individual named "Dominic Romello Webster" (WEBSTER), a black male with a date of birth of ███████, provided **THE EVERGREEN PREMISES** on numerous occasions as his place of residence. On September 16, 2024, while surveilling GREEN, agents observed WEBSTER arrive at **THE EVERGREEN PREMISES**. WEBSTER then appeared to conduct a hand-to-hand drug transaction out front of the residence before entering.

149. On September 17, 2024, telephonic GPS locators showed GREEN left the area of **THE EVERGREEN PREMISES** and was in the same vicinity as BRIDGERS's phone. Agents later seized approximately $250,000 from GREEN as he travelled to New York on behalf of

BRIDGERS. Agents believe BRIDGERS sent GREEN as a courier in order to conceal the nature, source location, ownership, or control of the seized drug trafficking proceeds.

150.    Investigators also know that GREEN, the current courier for the BRIDGERS DTO, not only transports drug proceeds and marijuana on behalf of the DTO, but also obtains quantities of marijuana from **THE SCHERING PREMISES**, described earlier in this affidavit. Investigators believe GREEN sells that marijuana and obtains his own drug proceeds.

151.    Investigators have been receiving court authorized GPS location data from ███ ███8381, a telephone device used by GREEN. Investigators know GREEN continues to frequent **THE EVERGREEN PREMISES** on a nightly basis. Investigators believe it is likely that evidence of GREEN's drug trafficking, such as drug proceeds, marijuana, electronic devices, and other paraphernalia will be located inside **THE EVERGREEN PREMISES**.

**H.    MARCO JONES and THE FORT PREMISES**

152.    As explained above, JONES was previously identified as a courier for the BRIDGERS DTO. JONES was responsible for transporting hundreds of thousands of dollars to New York and returning to Baltimore with hundreds of pounds of marijuana on a weekly basis. Investigators intercepted JONES communicating this activity over his telephone device ███ 6556, identified as **TARGET TELEPHONE 3**.

153.    For example, on March 4, 2024, at approximately 11:21 a.m., **TARGET TELEPHONE 3** received a call from ████4237, used by BRIDGERS. During this call BRIDGERS told JONES, "Yeah, I'm going to meet you to give you some bread." JONES asked, "Alright, umm, where you wanna meet me at? You wanna meet me in Canton?" BRIDGERS said, "I'm gonna be in the city like thirty minutes. Uh, Flushing not gonna be ready till five o'clock." JONES acknowledged, "Oh, alright." JONES continued, "I can leave at two or one thirty."

BRIDGERS replied, "Yeah leave at like one." JONES acknowledged, "Alright." BRIDGERS stated, "Cause it's really ready now, I just told him that time." JONES said, "Alright." BRIDGERS replied, "I'm bout to be there, so as soon as I get there I call you so we can link up." JONES acknowledged, "Alright."

154. Based upon my knowledge and experience, coupled with my knowledge of the **TARGET SUBJECTS**, I believe BRIDGERS had a large amount of drug proceeds ready for JONES to pick up and transport to New York, "I'm going to meet you to give you some bread." I also believe BRIDGERS told JONES the money was ready to be picked up now but wanted JONES to wait as the supplier would not be ready until five o'clock, "Flushing not gonna be ready till five o'clock." I know that during previous surveillance when JONES met with BRIDGERS, JONES always travelled directly to Flushing, New York further supporting my beliefs pertaining to this call.

155. On March 4, 2024, at approximately 12:25 p.m., **TARGET TELEPHONE 3** received a call from ████4237, used by BRIDGERS. During this call, BRIDGERS told JONES, "Co, matter of fact, come to the store." JONES acknowledged, "Alright." BRIDGERS said, "Cause I gotta, yeah, just come in. How long it's gonna take you?" JONES said, "Shhh, uh, lemme see. Put it in the GPS real quick. [Clears throat]. What we gotta do?" BRIDGERS replied, "Nothing. Yeah, I'm just ready to give it to you." JONES told BRIDGERS, "Oh, alright. Yeah, I'm like, twenty-twenty-twenty three minutes." BRIDGERS acknowledged, "Bet."

156. Based upon my knowledge and experience, I believe BRIDGERS was requesting JONES to meet him at his storage unit, "Co, matter of fact, come to the store." I believe JONES asked if they needed to do something additional ("…What we gotta do?"), and BRIDGERS advised he just wanted to give JONES the money, "Nothing. Yeah, I'm just ready to give it to you."

157.     Based on GPS data from JONES's GMC SUV, I know that following this call JONES travelled to Extra Space Storage at 3634 Falls Road, Baltimore, Maryland, where BRIDGERS is renting storage unit "2322."  Investigators obtained video footage from the facility that showed BRIDGERS giving JONES a large bag (suspected drug trafficking proceeds) which JONES placed into his trunk, depicted below.  JONES ultimately began traveling northbound on Interstate 95 towards New York.



158.     At approximately 3:51 p.m., **TARGET TELEPHONE 3** called ████4237, used by BRIDGERS.  During this call, JONES told BRIDGERS, "Yo, I'm an hour out yo." BRIDGERS replied, "Alright, um, um…" JONES cut BRIDGERS off stating, "Queens." BRIDGERS acknowledged, "Alright."

159.     Based upon my knowledge and experience, I believe JONES called BRIDGERS to inform BRIDGERS he was an hour out from Flushing, New York, "I'm, uh, an hour out yo."  I believe JONES wanted to inform BRIDGERS so that BRIDGERS could inform the source of supply.

160.     Additional surveillance of JONES in Flushing, New York showed he met a known source of supply (Yugang WENG) and obtained a substantial amount of marijuana, depicted

below.  It also showed JONES provided WENG with a large bag, believed to be drug trafficking proceeds, also depicted below.



161.    Based upon my knowledge and experience, I believe JONES arrived at the Flushing Garden Condominiums with the drug proceeds. I believe JONES transferred the drug proceeds to WENG.  While doing so, I believe WENG was mistaken and thought BRIDGERS would be meeting him.  I believe JONES then called BRIDGERS to inform he had transferred the money to WENG, "he came, he got the money but he, he talk about he uh, he was waiting on you."  I believe JONES explained that WENG was confused and was expecting BRIDGERS.  I believe WENG called his associate to discuss what he should do which was communicated in a Chinese dialect.  I believe JONES again explained to BRIDGERS that WENG thought BRIDGERS was coming to

meet him which was why WENG was confused, "Bro', he was sayin', I don't know, I think he was tryna' sayin' like he thought he was waiting on you." Once the call was over, I believe WENG proceeded to load JONES's GMC with hundreds of pounds of marijuana and JONES left.

162.     Based on additional intercepted calls, coupled with telephonic GPS data, I know JONES then met with a second source of supply where he obtained more marijuana.  Telephonic GPS data then showed JONES returned to Baltimore.

163.     On March 4, 2024, at approximately 10:40 p.m., **TARGET TELEPHONE 3** received a call from ▆▆▆▆4237, used by BRIDGERS.  During this call BRIDGERS told JONES, "We gonna go to uh, we gonna go to the whatcha call'em."  JONES asked, "Where?"  BRIDGERS replied, "Storage."  JONES said, "Alright, bet."  BRIDGERS said, "Alright you um, go out front, we gonna follow you."  JONES acknowledged, "Alright bet."

164.     On March 4, 2024, at approximately 11:00 p.m., **TARGET TELEPHONE 3** received a call from ▆▆▆▆4237, used by BRIDGERS.  During this call JONES said, "Yeah yo, we gotta go to the back don't we?"  BRIDGERS confirmed, "Yeah."  JONES said, "Alright, bet."

165.     Based upon my knowledge and experience, I believe JONES and BRIDGERS were returning from Baltimore with hundreds of pounds of marijuana picked up from New York.  I believe BRIDGERS and JONES met at BRIDGERS' old storage unit to unload the marijuana.

166.     After BRIDGERS moved his stash house to **THE SCHERING PREMISES**, investigators conducted surveillance of JONES returning from New York to **THE SCHERING PREMISES**, where he unloaded marijuana into the location.

167.     On March 14, 2024, investigators intercepted communications between **TARGET TELEPHONE 2** and **3** revealing JONES would be picking up drug proceeds on behalf of the MICKLOS DTO. Investigators conducted surveillance and observed JONES meeting TILMON.

TILMON placed a large, weighted suitcase (drug proceeds) into the rear of JONES's GMC as depicted in the red circle below.



168.    JONES then covered the suitcase and travelled to New York where he met a member of the XU MLO/DTO.  Later this night, JONES returned to Baltimore driving directly to TILMON's storage unit where investigators believe JONES unloaded a new supply of marijuana.

169.    Agents know JONES worked as a courier for both DTOs for months before the instant investigation and until approximately April 2024.  During this investigation, JONES travelled to New York on a near weekly basis, which trips investigators believe served to deliver drug proceeds and pick up marijuana.  At times, JONES even travelled to New York multiple times in a week.

170.    As investigators were monitoring JONES during this investigation, investigators learned JONES was residing at **THE FORT PREMISES**.  Information obtained through an administrative subpoena helped reveal JONES was leasing the residence under his own name. Investigators also conducted maintenance of the GPS device on his vehicle on numerous occasions while it was parked in the parking garage associated to **THE FORT PREMISES**.  GPS locators

from JONES' telephone device placed him at **THE FORT PREMISES** during the overnight hours, when JONES was not sleeping at his girlfriend's residence.

171.   Investigators were also monitoring an Instagram account used by JONES.   On or about February 11, 2024, JONES posted a video to his account "story."   In the video, GREEN, the current courier for the BRIDGERS DTO, was standing in the kitchen.   In the background of the video a money counter was observed sitting on the kitchen counter, depicted in the red circle below.



Investigators have seen the interior of apartments associated with **THE FORT PREMISES**. Investigators know that the kitchen depicted in the video matches the kitchens in the apartments associated to **THE FORT PREMISES**.

172. However, around April 13, 2024, JONES located and removed the GPS tracker investigators had placed on his GMC SUV. Following JONES locating the GPS device, JONES stopped working for the DTOs.

173. Investigators recently spoke with property management at **THE FORT PREMISES** and learned JONES is still residing at **THE FORT PREMISES**. Investigators have also observed his GMC SUV parked in the parking garage as recent as September 9, 2024.

174. Agents located JONES's GMC parked in the parking garage on September 9, 2024. An administrative subpoena also revealed that JONES is still leasing **THE FORT PREMISES** under his name.

175. Although JONES is not currently working for the DTOs being investigated, based on the information above, I believe **THE FORT PREMISES** will contain evidence of drug trafficking, such as drug proceeds, drug ledgers, scales, and other paraphernalia. More importantly, investigators believe JONES' telephone devices, specifically **TARGET TELEPHONE 3**, will be located in **THE FORT PREMISES**.

## I. PRAVEEN MORGAN

176. During the course of this investigation, MORGAN has been identified as a DTO member in possession of the DTO shop phones and responsible for organizing marijuana orders and supplies.

177. MORGAN, who sometimes employs the moniker "Veen," has been intercepted communicating with MICKLOS throughout this investigation discussing marijuana sales, seizure of drug proceeds, collection of drug proceeds and inventory of the DTO's marijuana supplies. MORGAN has also been observed in Maryland picking up bulk U.S. currency drug proceeds from

TILMON and transporting them back to New York in a manner to conceal the nature, source, location, ownership, or control of those proceeds.

178.    For example, on March 28, 2024, at approximately 2:44 p.m., TILMON, using **TARGET TELEPHONE 2**, called ████ 1198, believed to be used by Dacia Carter ("CARTER").  Below is the pertinent portion of the call that started at 2:46 p.m.  TILMON asked, "Did you get a chance to count them twenties?  He gonna be there at seven.  Imma leave here at five."  CARTER stated, "Yeah I already did all that."  TILMON responded, "You counted all the twenties?"  CARTER advised, "Yeah I counted the twenties, the tens and the fives.  Just the fifties and hundreds are still left."    TILMON asked, "You already undid the other bag?"  CARTER answered, "Yeah.  That's done."  TILMON replied, "Alright.  I appreciate that."  CARTER answered, "You're welcome babe.  You heard me though, I said.  You heard when I said it was only the um hundreds and fifties left right?"  TILMON responded, "Yeah. You said you didn't do the hundreds and fifties."  CARTER stated, "Yeah."  TILMON stated, "That's fine."  CARTER responded, "Cause I gotta, I gotta leave out right.  I gotta leave out in a little bit and handle some business so I'm in the shower."  TILMON responded, "I mean that's fine.  I didn't mean to hold you up."  CARTER said, "Oh no you didn't hold me up babe.  I just you know, you know (U/I)."    TILMON responded, "Yeah I didn't mean to hold you up.   My fault."  CARTER advised, "I have to go meet somebody real fast."  TILMON asked, "Huh."  CARTER responded, "I said I got to meet somebody real fast but you, you ain't holding me up so."  TILMON responded, "Oh alright alright."  CARTER stated, "I just gotta leave out real fast.  If I get back in time before you I'll still do it but it depends."  TILMON responded, "No you, I, I don't know.  I'll probably be back (U/I) like five six cause I got to meet him at seven out there."  CARTER responded, "Okay.  Well yeah baby that sounds (U/I).  The twenties is up against

63

the wall, its tens and stuff, the hundreds and fifties and stuff still on the, in the middle of the just sittin there." TILMON asked, "Did you already group them in tens or no?" CARTER responded, "Huh?" TILMON asked, "Did you group them in tens or nah? I can do that if you didn't. Don't worry about that." CARTER asked, "You sure?" TILMON stated, "I just needed them counted." CARTER stated, "I can do it before I leave out the door." TILMON responded, "Nah nah nah nah nah nah. I just needed um counted. That's all." CARTER acknowledged, "Okay. Okay." TILMON responded, "Nah, That's it. I can do the the group'em and shit." CARTER stated, "Okay. Well it's done already." TILMON acknowledged, "I appreciate it." The pertinent part of the call ends and switches to general conversation at 2:49 p.m.

179. On March 28, 2024, at approximately 4:03 p.m., TILMON, using **TARGET TELEPHONE 2**, received a call from ████4897, used by Jamir Richburg ("RICHBURG"). During the call, TILMON stated, "Veen like nah bro just close early at five o'clock and meet me out Aberdeen so I can get the money so I got to leave here early in an hour anyway so it's like." RICHBURG stated, "Wait. Veen took the money up?" TILMON responded, "Yeah cause he don't. Frankie don't want wanna use uh uh uh Co like that no more." RICHBURG stated, "Because what happened with (U/I)." TILMON responded, "No he just don't want to use him like that no more cause he saying that Co do business with other people that Frankie don't fuck wit. I guess." RICHBURG stated, "But Co consistent as fuck." TILMON replied, "Yeah so he asked me could Bill uh do what he was doin and drive up to New York and shit like that." RICHBURG stated, "Fuck ass no." TILMON replied, "I'm like that's not the best idea. Feel me." RICHBURG stated, "That no (U/I) is not capable of shit like that. Love him to death but no." TILMON continued, "Yeah, I just was tellin him like that's not the best idea like." RICHBURG responded, "Jesus fuckin Christ." TILMON continued, "No that's not the best idea and then I brought it up

64

to B cause B keep, he keep talkin to me about how he that him." RICHBURG interrupted, "Wanna get paid more." TILMON acknowledged, "Yeah. Him and Smoke need more money. They should be (U/I)." RICHBURG stated, "So he want to get paid more. (U/I) what he need to be doing coming to work on time. Coming to work at all."

180.     On March 28, 2024, at approximately 5:09 p.m., TILMON, using **TARGET TELEPHONE 2**, received a call from ███████4897, sued by RICHBURG. During the call, TILMON stated, "I gotta leave here meet Veen by seven o'clock." RICHBURG asked, "You got the money with you or you got to go back to get it?" TILMON replied, "Nah it's at the crib." RICHBURG stated, "Oh my goodness." TILMON responded, "I counted it I just didn't like separate it." RICHBURG interrupted, "Bring it." TILMON responded, "No I didn't separate it. I still gotta put the tens with the tens type of shit but." RICHBURG answered, "Oh you just timed it all out when you were getting it." TILMON responded, "Um hm." RICHBURG asked, "Okay. Wait so if Co's not bringing the stuff who is?" TILMON replied, "I don't know." RICHBURG acknowledged, "Okay."

181.     Based on investigators' knowledge and experience, investigators believed TILMON was preparing bulk drug proceeds in Baltimore with anticipation that MORGAN (a/k/a "Veen") would be picking them up to transport them to New York.

182.     At approximately 6:15 p.m. investigators established physical surveillance of TILMON's apartment located at 1005 Warwick Dr. Aberdeen, Maryland.

183.     At approximately 6:33 p.m. investigators observed TILMON park his blue Jeep Wrangler in front of the location and remove an empty grey Rubbermaid tote from the passenger-side rear seat. TILMON also removed a black and red "DTLR" bag. TILMON took both items inside his apartment at that time.

184.     At approximately 7:19 p.m., TILMON exited the apartment building carrying the same grey tote, however this time the tote appeared to be significantly heavier.  TILMON had to place the tote on the ground before opening the passenger-side rear door and placing the tote inside.

185.     TILMON then left the area and traveled to the parking lot of the Planet Fitness, located at 1010 Beards Hill Rd., Aberdeen, Maryland.  Investigators positioned themselves in the parking lot and observed TILMON remove the above-described tote and place it inside MORGAN's BMW-make vehicle, which was already parked in the lot as depicted in the red circle below.



This exchange lasted approximately 10 seconds, and both parties left the parking lot quickly and in separate directions.  Further surveillance of the BMW confirmed the tag as temporary New Jersey registration C020707, registered to an individual identified as "Praveen Morgan" (MORGAN).

### J.  CAN XU, HUAYI ZHONG, ZEBIN LIU, CHUNBING QIN, QIHAI TAO, PENG HUANG, and ISAAC HUYNH

186.     During this investigation, XU was identified as a multi-million-dollar marijuana distributor operating an DTO in New York, as well as being the leader of a well-structured MLO in which he employs several confederates to conceal the nature, source, location, ownership, or

control of the drug proceeds. These confederates included: ZHONG; LIU; QIN; TAO; HUANG; and HUYNH.

187. For example, on April 14, 2024, at approximately 6:56 p.m., XU used **TARGET TELEPHONE 6** to call **TARGET TELEPHONE 11**, used by TAO. During the call, XU asked, "If you receive the paper, how do you bring it back?" TAO replied, "Where do you want me to deliver?" XU answered, "Seattle." TAO replied, "Paper… Paper... bring to Seattle. Ugh, this time may not work, can we do next time? Next time should no have problem." XU interrupted, "Hum." TAO continued, "For the next time, I will ask my little brother to run, then when he come back, he will directly bring to Seattle. For the paper, I cannot insure it, then I may give some transportation fee to my little brother, check on his spending. What do you think?" XU asked about a "transportation fee," and TAO discussed providing a fee to an individual he referred to as his "little brother." Due to bad signal, the call was terminated before TAO specified a fee.

188. On April 14, 2024, at approximately 6:58 p.m., XU using **TARGET TELEPHONE 6** again called **TARGET TELEPHONE 11**, used by TAO. During this conversation, XU asked, "If they could receive transportation this time?" TAO replied, "Receiving transportation has no problem. If needs to bring paper, it has to be next time, because this time, I already helped someone else to bring, after helping other people, I got a proof of fund, if it added up from you, it is definitely not enough." XU replied, "Oh, okay, sure, next time… next time also need proof of fund." TAO asked, "Two-hundred thousand?" XU replied, "Yes." TAO asked, "Or something else?" XU replied, "It should be almost two-hundred thousand." TAO said, "Okay, okay, no problem, no problem. Over here, I already told my boss, I will use the money from selling car to do proof of fund. It will be safer when flighting." XU replied, "Okay, yes, no problem." TAO said, "If you want me to bring, you need to tell me in advance, because now I have Atlanta

67

and Tampa, I will bring for them in different time. I am running this alone, I can one bring one at once. I can make arrangements, if I know in advance." XU replied, "Okay, I understand." The conversation then concluded.

189. Based on my knowledge and experience, I believe the above calls reflect TAO's involvement in the transportation and laundering of drug trafficking proceeds. I understand that when XU and TAO referred to "paper" in the above-described calls, they were referring to drug trafficking proceeds. I understand XU to have been asking TAO to arrange the transportation of a large quantity of drug trafficking proceeds—approximately $200,000—to Seattle. I believe TAO told XU that another customer's money was being transported at this time, and that XU's proceeds would have to be moved later. I further understand that the "transportation fee" referred to a fee charged by TAO for his transportation/laundering services.

190. On May 13, 2024, at approximately 4:23 p.m., TAO using **TARGET TELEPHONE 11** called ████-4089, used by HUANG. During the call, TAO directed HUANG to pick up "money" located at a storage unit. TAO stated he would send HUANG the unit's "code" and the "amount." TAO directed HUANG to "bring a suitcase" and call an Uber. TAO told HUANG he sent HUANG the address already and that it was "fifty minutes away."

191. Based on other intercepted calls, investigators believe HUANG was picking up drug trafficking proceeds in Atlanta on behalf of TAO. Specifically, investigators believe the drug trafficking proceeds were from the Atlanta-based wing of the MICKLOS DTO, and HUANG was set to meet the leader of this DTO to obtain the proceeds.

192. On May 13, 2024, at approximately 11:01 p.m., TAO using **TARGET TELEPHONE 11** called **TARGET TELEPHONE 6,** used by XU. During the call, XU complained, "That pussy only have fifty thousand dollars, wow, fuck."

193.    Based on the above-described calls, investigators believe HUANG had obtained the money from the storage unit on behalf of XU.  Investigators believe XU complained to TAO that the customer had only left $50,000 to be picked up.

194.    On June 23, 2024, at approximately 10:46 p.m., TAO using **TARGET TELEPHONE 11** called ▮▮▮▮4173, used by an unknown female ("UF4173").  During the call, TAO said, "Baby, I am going, going to load the stuff I am just done with onto my car.  Then, you will drive the car inside.  How does it sound?"  UF4173 replied, "Okay."  TAO later said, "I have just finished.  I am going to load the car now." UF4173 asked, "Shall I go drive the car now or wait for you to call me?"  TAO said, "Baby, wait for my call.  Let me load the car first."

195.    Based on my knowledge and experience, I believe that when TAO used the term "stuff," he was referring to marijuana, in this case, a large quantity of marijuana he was loading into his car.  I further understand that TAO wanted UF4173 to drive that car, loaded with marijuana, into the parking garage ("Drive the car inside") at their residence.  Investigators know this residence has an attached garage to the location.

196.    During the course of this investigation, West 10th Street, New York, New York ("the WEST 10th ST. PREMISES") was identified a location in which XU's confederates, namely ZHONG, were often observed bringing suspected bulk U.S. currency drug proceeds into or out of.

197.    For example, on April 7, 2024, at approximately 7:24 p.m., ZHONG using **TARGET TELEPHONE 7** called **TARGET TELEPHONE 6**, used by XU.  During the call, ZHONG asked XU what to do with "the money."  XU directed ZHONG to "put it at home." Based on the evidence gathered during the investigation to date, I believe ZHONG had picked up drug trafficking proceeds from a XU MLO/DTO customer.

198.    On June 7, 2024, at approximately 11:29 p.m., XU called ZHONG.  During the call, XU directed ZHONG to bring a "box of paper" over to "West 10th Street."

199.    At approximately 11:58 p.m., ZHONG arrived at West 10th Steet in New York, New York, in his white Mercedes Benz bearing New York registration KUJ-9652.  ZHONG removed a box from the trunk and walked to West 10th Street. Seconds later, ZHONG left, no longer holding the box. ZHONG can be seen getting into the passenger side of the vehicle as he departs in the below photograph:



200.    Based on the above-described call and surveillance, I believe ZHONG, at XU's direction, transported drug trafficking proceeds ("paper") in the box ZHONG removed from his trunk.

201.    On June 18, 2024, at approximately 11:35 p.m., XU using **TARGET TELEPHONE 6** called **TARGET TELEPHONE 7**, used by ZHONG.  During the call, XU directed ZHONG to take money to "West 10th Street."

202.    At approximately 11:38 p.m., ZHONG called ████████9921, used by HUYNH. During the call, ZHONG said he would be there in "twenty minutes to hand off some paper." HUYNH acknowledged.

203.    Moments later, at approximately 11:42 p.m., ZHONG exited his residence carrying a large bag, which appeared to be weighed down.

204.    At approximately 12:02 a.m., ZHONG arrived at West 10th Street. Upon arriving, ZHONG called HUYNH. During the call, ZHONG asked, "Is it brother Hue?" HUYNH replied, "Yes." ZHONG said, "Hey, Brother Hue. I'm there already." HUYNH replied, "Okay, alright. I am coming downstairs now." ZHONG removed a large bag from the rear seat of the vehicle he was driving, as depicted in the red circle within the image below.



The bag appeared to be the same one ZHONG had carried out of his residence. At the same time, HUYNH exited West 10th Street and both men then walked to West 10th Street together, and moments later, ZHONG left without the bag.

205.     At approximately 12:25 a.m. the same day, XU using **TARGET TELEPHONE 6** called ████████2425, used by QIN, a known source of supply for the XU MLO/DTO.  During the call, XU said, "Boss Qin.  Ten units has been delivered."  QIN replied, "Delivered ten units to him already?  Okay."

206.     On June 28, 2024, investigators were conducting physical surveillance at the WEST 10th ST. PREMISES.

207.     Investigators observed HUYNH exit with a black book bag and enter a vehicle as a passenger.  Investigators followed HUYNH as he arrived at a FedEx Store located at 526 86th Street, Brooklyn, New York.  HUYNH entered the store and proceeded to ship two packages, as contained in the red circle depicted in the image below.



208.     While in the store, agents overheard HUYNH inquiring as to why his previous packages had not been shipped out of New York yet.

209.     Investigators learned from an administrative subpoena that four packages addressed to "Kwai Ling Kwok" at an address for a FedEx Store located at 9919 SE Sunnyside Road,

Clackamas, Oregon had recently been shipped by HUYNH, who provided the WEST 10th ST. PREMISES as his return address.

210. On June 30, 2024, at approximately 11:36 p.m., XU using **TARGET TELEPHONE 6** called ████ 9921, used by HUYNH. During the call, XU told HUYN he was "at the door."

211. Agents reviewed surveillance camera footage from this time, which showed XU arriving at the WEST 10th ST. PREMISES in his Honda sedan and stopping curbside. HUYNH then exited the WEST 10th ST. PREMISES and retrieved a weighed-down bag from the Honda's trunk. HUYNH then entered the WEST 10th ST. PREMISES carrying the bag.

212. On July 1, 2024, agents learned via administrative subpoena that HUYNH shipped two new FedEx parcels from the FedEx store located at 526 86th Street, Brooklyn, New York, each weighing 15 pounds. The packages were once again addressed to "Kwai Ling Kwok" the same FedEx Store address in Oregon. The packages were shipped by HUYNH, who again provided the WEST 10th ST. PREMISES as his return address.

213. The six above-described packages shipped on June 27, June 28, and July 1, 2024, were subsequently held by law enforcement pending a search and seizure warrant, on the belief that the packages were likely to contain drug trafficking proceeds.

214. On July 1, 2024, at approximately 10:11 p.m., agents intercepted a call between **TARGET TELEPHONE 6** and **TARGET TELEPHONE 11**, used by TAO. During the call, XU said, "Motherfucker! The Seattle paper route I sent money with got busted today. Holy Shit! Possibly because of July 4th. Therefore, do not ship anything out." XU later said, "He has been operating without any issues for so many years. Today got busted." TAO asked, "Wow… Was it a lot, the loss?" XU replied, "Seventy units."

215.    Due to my knowledge and experience with this investigation, I know XU often uses the terms "chicken" and "unit" to refer to $10,000 in drug trafficking proceeds. Based on the above-described events, I believe XU was telling TAO that the packages shipped by HUYNH had been seized by law enforcement.  I further understand that these shipments were sent along a larger "Seattle paper route," which I believe indicates that the packages were to be transported again after arriving in Oregon.   I also believe XU told TAO that the packages contained approximately $700,000 in drug trafficking proceeds ("Seventy units.").

216.    On July 2 and July 3, 2024, the Honorable Jeffrey Armistead, U.S. Magistrate Judge for the District of Oregon, signed search and seizure warrants for the six above-described parcels (Case Nos. 24-mc-00695). Agents executed the warrants and seized over $650,000 in U.S. currency from the parcels. Agents observed the money was very well organized, sorted by denominations, vacuum sealed and precisely laid out (see pictures below). Based on investigators' training, knowledge, and experience, investigators know this is consistent with how drug traffickers package their proceeds.  The amount seized is consistent with XU's description of having lost approximately $700,000:



217.    On July 3, 2024, at approximately 6:44 p.m., XU using **TARGET TELEPHONE 6** called ██████2425, used by QIN.  During that call, XU asked, "What's going on?"  QIN replied, "You need to comfort Brother B.  To have a heart to heart conversation over a cup of tea."

XU stated, "He will be fine by having a drink." Moments later, an unknown third party (UM2) got on QIN's line and spoke to XU. UM2 said, "Can, what is up?" XU replied, "What's up? Is everything okay?" UM2 stated, "I am telling you. I am okay. I am afraid of that you guys misunderstand, so I notified President Qin right away on that day, to let him know the person is fine." XU asked, "Hey, have you received the document on the following day?" UM2 informed, "Not able to receive it, because Brother Hua/Hue's name is on the blacklist. I failed on that day was because I was in rush. I shouldn't have mailed the last two bags." XU replied, "Uh." UM2 continued, "Those are 280,000. Motherfucker." XU and UM2 continued discussing the issue with UM2's shipment, noting that security appeared to be heightened due to Independence Day. Later in the call, XU said, "I think you had better to use, not to use FedEx company, you find a way to dispatch by using pallet, it will be the safest way, but…" UM2 asked, "To transport by a pallet" XU replied "Yes, the pallet is like a…" UM2 interrupted, "Like those private jet." XU stated, "To transport by pallet, like those one board after another board, to transfer via airplane, then to be carried by in a truck and ship it over directly, but it will be longer period of time. However, you will be safe. I mean, just like us, for transporting the cigarettes out of country, we have used the office screen/room divider. We have stacked one cigarette after another into inside of the screen/room divider. The cost is higher, I have been doing for a long period of time, and I have never had any problem." After further discussion of future shipments, XU said, "It is kind of… doing paper… I previously have three routes for Seattle, and all of the three routes were fucking busted."

218. Based on my knowledge and experience, as well as the prior calls and package seizure, I believe "Brother B" is a close associate of—and source of marijuana supply for—XU and QIN. I believe the drug trafficking proceeds seized from the FedEx packages were destined

for QIN and "Brother B," and that QIN wanted XU to reassure "Brother B" regarding the seizure of the packages. I believe that UM2 was, in fact, "Brother B," and that during the call, he believed that HUYNH ("Brother Hua") had been "blacklisted" by FedEx because his name was on the packages that were seized. I know from my training and experience, that the callers were using the term "paper" to refer to drug trafficking proceeds during this call. I therefore understand that XU went on to direct "Brother B" to conceal the drug proceeds among shipments on pallets that would be transported by air or ground. Additionally, I believe XU told "Brother B" that three routes XU had been using to transport drug trafficking proceeds through the Seattle area had been "busted" by law enforcement.

219.    On August 1, 2024, at approximately 8:53 a.m., investigators intercepted communications between MICKLOS, utilizing **TARGET TELEPHONE 9**, and MACK, the leader of the Baltimore-based wing of the MICKLOS DTO, ████3862. During the call, MICKLOS told MACK, "He said, uh, he called his people and putting everything together now." MICKLOS later said, "Yeah. But, I'll, I'll call him periodically like, I'll call him in like, forty (40) minutes. I already called him ten (10) minutes ago. So, I'll call him in like, you know, like forty (40) minutes, forty-five (45) minutes, and just ask for an update, and he'll tell me." MICKLOS also told MACK, "It's only… it's only two hundred and like, fifty."

220.    GPS location data from MACK's Tahoe (**THE TARGET VEHICLE**) and phone[8] showed that MACK had driven from Baltimore to New York the night prior. Based on that information and what was said during the call, investigators believed MICKLOS was organizing

---

8 On June 11, 2024, the Honorable Copperthite, U.S. Magistrate Judge for the District of Maryland, authorized the installation of a GPS tracking device on MACK's vehicle (Case No. 24-mj-1460-ADC). On June 26, 2024, the Honorable Austin, U.S. Magistrate Judge for the District of Maryland, authorized the collection of location data from MACK's phone (Case No. 24-mj-01554).

a meeting between MACK, XU, and ZHONG to pick up 250 pounds of marijuana on behalf of the MICKLOS DTO.

221.    At approximately 9:45 a.m., agents established surveillance on MACK, who was parked in the vicinity of CubeSmart Self Storage located at 266 Wild Avenue, Staten Island, New York.  MACK was driving **THE TARGET VEHICLE**.  Agents maintained surveillance of MACK as he drove to a local food establishment.

222.    At approximately 11:25 a.m., agents established surveillance in the vicinity of the **KATAN PREMISES** and observed two cars parked at the location: ZHONG's black 2023 Chevrolet Suburban bearing NY registration T706557C (the **SUBURBAN**) was parked backed in the driveway, and LIU's grey 2023 BMW M235i bearing NY registration KI19 (the **LIU BMW**) was parked directly in front of the residence.

223.    At approximately 11:45 a.m., MACK, using ████████3862 called **TARGET TELEPHONE 6**, used by XU.  During the call, MACK asked, "Hey, what's going on?  Um... everything looking good?"  XU replied, "Yeah, uh... uh, where are you right now?"  MACK said, "Um... I'm at a diner. I don't know exactly where, but not too far, about ten minutes away from the hotel."  XU replied, "Uh, I think we... we... we can do at the... uh... at the hotel parking lot, so just wait there.  I'm... I'm... I'm telling my guy to drive over there... as soon as possible."  MACK acknowledged, and XU said, "Let... let... let me call him, and give you the ETA, right now."

224.    At approximately 11:48 a.m., investigators observed MACK return to Fairfield Inn and Suites located at 290 Wild Avenue, Staten Island, New York in **TARGET VEHICLE**.

225.    At approximately 12:29 p.m., XU called MACK.  During the call, XU informed, "Yo, they... they are there but, uh, it's on the next door.  The storage unit parking lot.  It's a

Suburban. Black color." MACK asked, "Storage unit parking lot?" XU confirmed, and MACK asked, "Okay. And, [voices overlap], what color then?" XU said, "Just... Uh, Suburban."

226. At approximately 12:32 p.m., agents observed **THE TARGET VEHICLE** move from the hotel parking lot to the CubeSmart parking lot. Investigators could see that both MACK and BROWN, another associate of the MICKLOS DTO, were in the vehicle.

227. At approximately 12:41 p.m., ZHONG's Suburban entered the CubeSmart parking lot and parked some distance away from **THE TARGET VEHICLE**. When ZHONG arrived, **THE TARGET VEHICLE** moved from its parking spot and parked directly next to ZHONG's Suburban. While the cars were parked next to each other, agents observed both rear trunk doors open, and bags being transferred from the Suburban to **THE TARGET VEHICLE**. Based on the above-described calls and surveillance—and numerous other instances during which similar transfers were observed taking place—investigators believed the bags contained marijuana.

228. At approximately 12:47 p.m., investigators observed MACK and BROWN exit the CubeSmart parking lot in the **THE TARGET VEHICLE**. ZHONG also exited the parking lot in the Suburban at that time. Investigators saw an individual in the front passenger seat of the Suburban, who was later identified as LIU.

229. At approximately 1:01 p.m., the Suburban returned to 715 Katan Avenue, Staten Island, New York, 10312 (the **"KATAN PREMISES"**), a location recently identified as LIU's residence. Upon parking, investigators saw ZHONG and LIU enter the KATAN PREMISES. Investigators saw that ZHONG was carrying a weighted bag that, based on the above-described calls and surveillance, investigators believe contained drug trafficking proceeds.

230. At approximately 1:24 p.m., LIU exited the KATAN PREMISES with a black squared-off plastic bag containing the suspected drug proceeds (contained in the red circle depicted

in the image below) and walked toward LIU's BMW make vehicle. LIU placed the bag into the BMW's trunk, got in the driver's seat, and left the area in his car.



231.    Based on the above-described calls and surveillance, I believe ZHONG and LIU took 250 pounds of suspected marijuana from the KATAN PREMISES and delivered it to MACK on behalf of the XU MLO/DTO. I further believe that during the exchange, MACK delivered drug trafficking proceeds to ZHONG and LIU on behalf of the MICKLOS DTO. I believe those proceeds were in the black bag LIU carried out of the KATAN PREMISES.

232.    On August 5, 2024, at approximately 6:05 p.m., XU using **TARGET TELEPHONE 6** called **TARGET TELEPHONE 7,** ZHONG. During the call, ZHONG told XU he would be at "715" in ten minutes. ZHONG told XU he would "pack nine bags of stuff."

233.    Based on my knowledge and experience, I understand this call to mean that ZHONG was going to the KATAN PREMISES ("715") to pack nine back of marijuana. I know

from evidence gathered during this investigation that the XU MLO/DTO often refers to marijuana as "stuff."

## IV.    BIOMETRIC UNLOCKING

234.    In my training and experience, and participation in this investigation, it is likely that electronic devices with biometric unlocking features, such as fingerprint unlocking or facial recognition, will be found within the **TARGET PREMISES** or the **TARGET VEHICLE**, or on the **TARGET SUBJECTS**.  Based upon my training and experience, I know that these devices support biometric unlocking features.

235.    I know from my training and experience, as well as from information found in publicly available materials, that some models of devices, such as some Apple iPhones and iPads, and the Samsung Galaxy, offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of an alphanumeric password or pattern password.  In addition, newer versions of the Apple iPhone and related Apple products contain a "Face ID" feature that allows the phone to be unlocked by scanning a user's face.  Some encrypted messaging applications also offer their users the ability to unlock the application using a fingerprint, and the WhatsApp end-to-end encrypted messaging application allows users to lock their messages using biometric authentication tools.

236.    If a user enables fingerprint unlocking, he or she can register a fingerprint, and frequently more than one, that can be used to unlock that device or application. The user can then use any of the registered fingerprints to unlock the device/application by pressing the relevant finger(s) to the device's fingerprint sensor, which may, for example, be integrated into the home button, integrated into the screen, or installed on the back of the device. In my training and experience, smartphone users commonly enable fingerprint unlocking when it is available because

it is considered to be a more convenient way to unlock the device/application than by entering an alphanumeric or pattern password.

237.    In some circumstances, a fingerprint cannot be used to unlock a device even if fingerprint unlocking is available and enabled, and a passcode or password must be used instead. These circumstances might, or might not, include: (1) when more than 48 hours has passed since the last time the device was unlocked, (2) when the device has not been unlocked for 8 hours and the passcode or password has not been entered in the last 6 days, (3) when the device has just been restarted or powered on, (4) when attempts to unlock via fingerprint have failed a specified number of times, and (5) when the device has received a remote lock command. Thus, in the event law enforcement encounters a locked device, the opportunity to unlock the device via fingerprint may exist only for a short time.

238.    The passcode or password that would unlock a given device recovered during execution of the requested warrant likely will not be known to law enforcement. Thus, in attempting to unlock any such devices for the purpose of executing the searches authorized by the requested warrants, it will likely be necessary to inform the **TARGET SUBJECTS** that the warrant requires them to press a finger or thumb to the Touch/ID reader of the devices capable of biometric unlocking, or to hold the device(s) to their faces to activate any facial recognition biometric unlocking.  This is similarly true for any applications that the user has chosen to secure with a biometric lock.  The government may not otherwise be able to access the data contained on those devices, or in those applications, for the purpose of executing the search authorized by this warrant.

239.    Due to the foregoing, because I have probable cause to believe that, as specified above, that any cellphone used by the **TARGET SUBJECTS** has biometric features engaged, I

seek permission for law enforcement personnel to: (1) inform **TARGET SUBJECTS** that they are required to place a finger or thumb to the fingerprint scanner of the specified electronic devices; and/or (2) hold the specified electronic devices in front of the faces of **TARGET SUBJECTS** for the purpose of attempting to unlock the specified devices in order to search the contents as authorized by this warrant.

240. The government will use all reasonable efforts to protect the privacy interests of third parties, including the **TARGET SUBJECTS** family members/co-occupants, in conducting the search authorized by this warrant. The government agents understand that this search relates to devices and other evidence used by **TARGET SUBJECTS** to further the criminal scheme. To identify devices that are used by the **TARGET SUBJECTS**, law enforcement will attempt to ask **TARGET SUBJECTS** to identify which device(s) are theirs or used by them (and which belong to others), and/or to ask other residents of the house which devices are owned or used by **TARGET SUBJECTS**.

## V. CONCLUSION

241. Based on the foregoing, I submit that there is probable cause to believe that within the **SUBJECT PREMISES, TARGET VEHICLE** and on the persons of the **TARGET SUBJECTS** are fruits, evidence and instrumentalities of the above-described **SUBJECT OFFENSES**.

242. Based on the foregoing, I further submit that there is probable cause to determine that the **ARREST SUBJECTS** have committed the **SUBJECT OFFENSES**.

243. WHEREFORE, in consideration of the facts presented, I respectfully request that this Court issue search warrants for the **SUBJECT PREMISES**, **TARGET VEHICLE**, and **TARGET SUBJECTS**, authorize the search and the seizure of the items described in Attachment

B, which constitute fruits, evidence and instrumentalities of violations of 21 U.S.C. §§ 841 and 846 and 18 U.S.C. § 1956, and authorize complaints and arrest warrants for the **ARREST SUBJECTS**.

244.   I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Respectfully Submitted,

Ryan Welsh, Special Agent
Federal Bureau of Investigation

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 4(d) this _____23rd_____ day of September, 2024.

Honorable A. David Copperthite
United States Magistrate Judge
District of Maryland

## Attachment A-1

**6962 Rockfield Road,** Catonsville, Maryland 21244
("THE ROCKFIELD PREMISES")

**THE ROCKFIELD PREMISES** is described as a brick row home type residence with a green door and a doorbell camera. The numbers "6962" are not affixed but the residence to the left lists "6964" on their front door and the residence to the right lists "6960" on their front door.



**Attachment A-2**

**5454 Nicholson Lane, Apt 412,** North Bethesda, Maryland 20852
("THE NICHOLSON PREMISES")

**THE NICHOLSON PREMISES** is described as a multi-unit apartment building with the number "412" affixed to the right of the door. Apartment "412" is located on the 4th floor of the building.



**5961 Schering Road,** Rosedale, Maryland 21206
("THE SCHERING PREMISES")

**THE SCHERING PREMISES** is described as a row home type residence with white siding and a white storm door. The numbers "5961" are affixed above the front door.



# Attachment A-4

**3701 Evergreen Avenue,** Baltimore, Maryland 21206
("THE EVERGREEN PREMISES")

**THE EVERGREEN PREMISES** is described as a duplex style brick row home. The numbers "3701" are affixed to the right of the door.



**Attachment A-5**

**8001 Woodmont Avenue, Apartment 406**, Bethesda, Maryland 20814
("THE WOODMONT PREMISES")

**THE WOODMONT PREMISES** is described as an apartment located on the 4th floor of a multi-unit apartment building known as the "8001 Woodmont". The numbers "406" are affixed to the left of the door.



## Attachment A-6

**900 E. Fort Ave, Apartment 518**, Baltimore, Maryland 21230
("THE FORT PREMISES")

**THE FORT PREMISES** is described as an apartment located on the 5th floor of a multi-unit apartment building known as the "Anthem House". The numbers "518" are affixed to the right of the door.



**Attachment A-7**

**2907 Clearview Avenue, 2nd Floor,** Baltimore, Maryland 21234
("THE CLEARVIEW PREMISES")

**THE CLEARVIEW PREMISES** is described as the left side of a brick duplex with "2907 B" located on the front door. The 2nd floor entrance is located to the left side of the residence, with a white storm door and black light affixed to the top right of the door.



## Attachment A-8

**555 President Street, Unit 602**, Baltimore, Maryland 21202
("THE PRESIDENT PREMISES")

**THE PRESIDENT PREMISES** is described as a one-bedroom apartment located on the 6th floor. The numbers "602" are affixed to the right of the door.



<u>Attachment A-9</u>

**2027 North Pulaski Street,** Baltimore, Maryland 21217
("THE PULASKI PREMISES")

**THE PULASKI PREMISES** is described as a row home with a white security door and a electric car charger on the lower front of the residence. The numbers "2027" are affixed on top of the front door.



<u>**Attachment A-10**</u>

**6006 Hunt Ridge Road, Apt 2521**, Baltimore, Maryland, 21210
("THE HUNT RIDGE PREMISES")

The **HUNT RIDGE PREMISES** is described as an apartment located on the 1st floor of a multi-unit apartment building. The numbers "2521" are affixed to the apartment door.



<u>**Attachment A-11**</u>

**The SHAWAN PREMISES 100 Shawan Road, Apt. 245, Cockeysville, MD 21030**
("THE SHAWAN PREMISES")

**The SHAWAN PREMISES** is described as a one-bedroom apartment located on the 2nd floor. The numbers "245" are affixed to the right of the door.



The person of **Malik BRIDGERS** ("BRIDGERS"), described as a black male with a date of birth of ▇▇▇▇▇▇▇



The person of David HILLIARD ("HILLIARD"), described as a black male with a date of birth of ███████████



The person of **Derian GREEN** ("GREEN"), described as a black male with a date of birth of



<u>**Attachment A-15**</u>

The person of **Marco JONES** ("JONES"), described as a black male with a date of birth of <span style="background:black">   </span> <span style="background:black">    </span>



<u>**Attachment A-16**</u>

The person of **Emanuel DUKES** ("DUKES"), described as a black male with a date of birth of ███████████



The person of **Steven MACK** ("MACK"), described as a black male with a date of birth of ▮▮▮▮
▮▮▮▮▮



The person of **Omar BROWN** ("BROWN"), described as a black male with a date of birth of



**Attachment A-19**

A 2022 Chevrolet Tahoe bearing Maryland registration 6GD5306 and vehicle identification number (VIN) 1GNSKPKD1NR242429, and registered to Steven Leroy Mack Jr., 5503 Chandler Avenue, Baltimore, Maryland 21207.



# ATTACHMENT B
## Items to be Seized

The items to be seized are the evidence, fruits, and instrumentalities of violations of 18 U.S.C. 1956(h) (Conspiracy to Commit Money Laundering) and 21 U.S.C. 846 (Conspiracy to Distribute Controlled Substances), for the period from January 1, 2023 to the present, including the following:

1.      Controlled substances;

2.      Paraphernalia used in the manufacture, preparation, packaging, or weighing of illegal narcotics in preparation for distribution, to include, scales, plastic bags, gelatin capsules, vials, cutting agents (such as Mannitol and Quinine), and kilogram wrappers;

3.      Currency or currency equivalents;

4.      Records of narcotics or money laundering transactions including, but not limited to, books, ledgers, receipts, notes, pay and owe sheets, and other papers relating to the manufacture, transportation, possession, and distribution of controlled substances or the receipt and disposition of proceeds derived from the sale of illegal narcotics;

5.      Financial records and other records or documents reflecting money laundering, narcotics trafficking activity, or the disposition of narcotics proceeds, including, but not limited to, currency; financial instruments; stocks; bonds; jewelry; precious metals; bank checks; cashier's checks and receipts for such checks; Western Union receipts; money orders; money order receipts; credit cards; credit card records; pre-paid credit cards; green dot cards and documents relating thereto; vehicle registrations; real estate records; income tax returns and any documentation relating to the payment of any income tax; mail and contract mail carrier records; documentation and receipts relating to any safe deposit boxes and keys to safe deposit boxes; documentation and receipts relating to any storage facilities and keys to those storage facilities; devices capable of counting large sums of currency; other items of value or proceeds derived from the sale of illegal narcotics; and any other documents or evidence of financial transactions involving the receipt and disposition of the proceeds of illegal narcotics sales;

6.       Records that identify other co-conspirators and gang members, including, but not limited to: address books; telephone books; rolodexes; telephone bills and records; telephones/cellphones and the numbers and other data stored within those telephones; pagers and personal digital assistants, and the numbers stored inside those devices; devices capable of recording incoming telephone numbers, and the numbers stored within those devices; records of telephone calls, whether recorded electronically or in writing; notes reflecting telephone and pager numbers, or papers which reflect names, addresses, and telephone numbers of suspected co-conspirators; photographs (to include still photos, negatives, movies, slides, video tapes, and undeveloped film); and audiotape recordings of conversations, including those made over telephone answering machines;

7.     Documents or other records relating to state court proceedings involving other co-conspirators, including, but not limited to, charging documents and bail records;

8.     Identification documents;

9.     Records of travel including, but not limited to, tickets, transportation schedules, passports, automobile rental records, notes and receipts related to travel, and motel/hotel receipts;

10.    Indicia of occupancy, residency, rental, control, and/or ownership of the premises, including keys, photographs, deeds, mortgages, lease agreements, rental receipts, canceled checks, utility, cable, and telephone bills, titles, registration documents, and other documents;

11.    Safes, combination or key-lock strong boxes or other secure storage containers, suitcases, file cabinets and other types of containers, whether locked or unlocked; hidden compartments that may contain any of the foregoing; and the contents thereof; and

12.    Cellular telephones, tablets, pagers, or other portable electronic communications devices, and any memory cards for portable communications devices and any related records.